## Land v. Land.

(Decided June 12, 1931.)

(Dissenting Opinion June 16, 1931.)

128

FOWLER, WALLACE & FOWLER for appellant.

HUNT & BUSH, HARRY B. MILLER and B. L. KESSINGER for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

At the election held November 5, 1929, Charles Land, Republican, and J. Porter Land, Democrat, were opposing candidates for the office of sheriff of Fayette county. On the face of the returns Charles Land received 10,734 votes, and J. Porter Land received 10,737, a difference of 3 votes. The certificate of election was awarded Porter Land, and a contest was instituted by the appellant, Charles Land. The defendant filed a counter contest. After a painstaking trial on a voluminous record the circuit court adjudged that Porter Land had been elected by a majority of 16 votes. The case is before us on direct and cross appeals.

I. We are met at the threshold with the contention that the court erred in not sustaining a plea to its jurisdiction, based upon the premature filing of the contest. The law in effect at the time (section 1596a-12, of the Statutes, 1930 Edition) provided that a contest involving a county office should be filed within 10 days after the final action of the board of canvassers. In this case the facts, briefly stated, are these:

On November 8, the election commissioners completed their canvass and signed certificates of election

for this and other offices. Those certificates were contained in a bound volume with perforations between them and were signed in triplicate. The book is the same as that referred to in the opinion of Lilly v. O'Brien, 224 Ky. 474, 6 S. W. (2d) 715, which case involved the office of mayor of Lexington. The evidence shows that on that day the book containing the certificates was taken to the county court clerk's office and one of the commissioners stated to the clerk or his deputy, "Here it is," or, "Here is the book." The secretary of the commission testified that he told the clerk that they had finished their work, and: "Here are the books and records and certificates; I believe they belong to you." Later in the day the clerk examined the book and found that it contained the signed certificates. He put it in the place in which it was usually kept. It appears that memoranda were kept of the proceedings of the board of election commissioners, but that the minutes were not entered on the records until the 12th of November, and not signed by the commissioners until the 13th. Those minutes recited that the certificates of election for all candidates had been filled out in triplicate and delivered to the county clerk. The certificate of Porter Land was retained by the clerk until November 21, on which day Porter Land filed his post-election expense account. The clerk then delivered the certificate to Mr. Land's attorney and sent a copy to the secretary of state, retaining the other one in the book in his office. In the meantime Charles Land had filed his contest on November 16, and summons was served that day on the defendant, Porter Land.

By reason of the confusion in the statutes growing out of the subsequent enactment of the Corrupt Practice Act (Ky. Stats., sec. 1565b-1 et seq.), it became necessary for this court to determine, in Roberts v. Stumbo, 227 Ky. 334, 12 S. W. (2d) 1110, whether the time for the running of the 10 days' limitation should commence on the date the certificate of election was delivered to the successful candidate after he filed his post-election expense account (for which he is given 30 days) or when the certificate was delivered to the county court clerk. It was held that the filing of the record in the clerk's office set that statute in motion against the unsuccessful candidate and that he was required to take notice of the record in the clerk's office. It is claimed here, however, that this certificate was never filed in the clerk's office as there

was no indorsement thereon or other record of the filing made. The statute is silent as to the making of such a record. It is not unlike section 1656, subd. 1 of the Statutes, which provides for the filing of an affidavit in a circuit clerk's office and on which filing the clerk is authorized to issue an execution to some other county. The statute relating to that act does not require any record to be made of the filing of that affidavit, and it was held in Durham v. Farmers' Bank & Trust Co., 213 Ky. 208, 280 S. W. 962, that proof of the lodging of such an affidavit with the clerk was sufficient, even though no record was made and the instrument itself could not be found.

The procedure was in accordance with the practice theretofore followed, and the circumstances clearly show that it was the purpose of the election commissioners to file the certificates, and that as a matter of fact they did surrender their possession and their control over them and thus met the requirements of the statute. On the authority of Roberts v. Stumbo, supra, the circuit court properly held that the contest was not prematurely filed; that is to say, the 10 days began from the delivery of this certificate to the county court clerk and not from the date on which the successful candidate obtained possession of that certificate.

II. The Power House precinct in Lexington became quite a storm center around which the contest revolved. The returns showed that there were cast in that precinct, largely inhabited by colored people, 191 votes for Charles Land and 28 votes for Porter Land.

1. It is contended upon the counterclaim that the entire Power House precinct should have been stricken from the returns of election for two reasons: (a) Misconduct on the part of S. H. Kash, Republican challenger and inspector; and (b) because more than 20 per cent of votes cast were illegal.

(a) Richard Maloney, who appeared as the duly accredited challenger for the Democratic Party, testified that when he arrived at 6 o'clock the election was in progress and he took exception thereto because the polls had been opened prematurely; that Kash, with some profanity, declared that they were running the election to suit themselves; and that during the day (and after Maloney was sworn in as Democratic sheriff) Kash intimidated him by disclosing his badge of Deputy United

States Marshal and making him aware that he carried a pistol on his person. The other officers of the election and a university student, who was present at the polls during most of the day, testified that while there were some arguments between Maloney and Kash, they were not of a serious nature and no attention was paid to them. We have no difficulty in agreeing with the finding of the circuit judge that the evidence is wholly insufficient to show any intimidation of the voters or interference with an orderly election.

(b) It is submitted that it is the established rule that the vote of an entire precinct will be thrown out when as much as 20 per cent of the total vote was illegal. That rule is not so broad. It is only when it has been shown that such large proportion of the votes cast were illegal and it is not possible to determine how they were voted, and consequently to charge them up to the recipient, that the entire electorate of the precinct will be disfranchised. We have been able to learn in this instance that 26 votes were illegally cast for the contestant and one for the contestee. It was shown there were 15 additional illegal votes cast in the precinct, but there was no evidence to show how they voted. According to the certificate of the election officers, there were 219 votes cast, so it is readily apparent that the rule contended for cannot be applied. Muncy v. Duff, 194 Ky. 303, 239 S. W. 49; Marilla v. Ratterman, 209 Ky. 409, 273 S. W. 69; Siler v. Brown, 215 Ky. 199, 284 S. W. 997.

2. The evidence tends to prove that in entering the number of votes received by Porter Land on the certificate attached to the stub book a mistake of 10 votes was made. The clerk and other officers testified that there were only 18 votes cast for Porter Land, and they filed with their evidence what purports to be an original tally sheet which sustains the verbal testimony. Charles Land contends that the court should have deducted 10 votes from Porter Land on this account. A similar issue was raised in Wolff v. Clark, 212 Ky. 435, 279 S. W. 658, in which case it was sought to compel the election officers by mandamus to correct their certificate. The court held that this could not be done and that the only way in which the error might be corrected was by a contest of the election in the manner prescribed by law under which, upon a proper showing that the integrity of the ballots had been preserved, a recount thereof might be

had and the result of that recount, if different from the certificate, substituted for the result which had been certified by the officers of the election. Here, the contestant claims that since the court refused to count the ballots and thereby obtain the best evidence of the error, he should have accepted the verbal testimony supported by the tally sheet in this, a contest suit. The count of the ballots was refused for reasons to be stated. We cannot agree with appellant's contention. The result of an election cannot be shown by parol evidence of election officers or other witnesses to the count. School v. Bell, 125 Ky. 750, 102 S. W. 248, 31 Ky. Law Rep. 335; Browning v. Lovitt, 139 Ky. 480, 94 S. W. 661, 29 Ky. Law Rep. 692.

3. The contestee in his counterclaim charged (a) that the first 28 votes cast in the Power House precinct were illegal because no Democratic election officer was present at the time, and also charged (b) that a number of votes were cast by those who resided out of the precinct. A few were challenged on other grounds. The judge sustained those contentions, except that he declined to eliminate a number of the votes because the evidence was insufficient to show how the parties had voted. He did find, however, that 26 votes should be deducted from Charles Land and one vote from Porter Land. In his opinion he did not state upon which of these grounds the respective votes were deducted. Looking to the pleadings and proof, it appears that of the 26 votes deducted from Charles Land, 10 of them were deducted only because they were cast when there was no Democratic officer present, and 12 only because the voters did not live within the precinct. Four of the votes came within both classifications. The one vote (James Davis) deducted from Porter Land was cast before the arrival of McGurk. The legality of the vote was challenged by the contestee, but he testified that he voted for the contestee, and it is chargeable to him under authority of Drennan v. Roberts, 234 Ky. 574, 28 S. W. (2d) 735.

(a) The evidence for the contestant was to the effect that the polls were opened two or three minutes after 6 o'clock; that three or four minutes were consumed in arranging the paraphernalia for the election; and that a crowd of voters was gathered seeking an opportunity to cast their ballots that they might get away to work. The polls were thus opened without

either the Democratic judge or sheriff being present. His witnesses say that only 4 or 5 votes had been cast before McGurk, the Democratic judge, appeared, and that Maloney, the Democratic challenger, came a moment or two before McGurk. The man appointed as sheriff never appeared, and about 10 or 11 o'clock Maloney was sworn in as such officer. It appears, however, that before this hour he had actively participated in the conduct of the election.

On the contrary, Mr. Maloney testified that he arrived at the polling place one minute after 6 o'clock, and that he looked at the stub and found that 12 ballots had been issued. Five or 6 voters were then within the polling place, and 4 of them still had the ballots in their possession. He testified that McGurk came at 6:20 o'clock and that 16 votes were cast between the time he arrived and McGurk arrived, thus making 28 ballots voted or issued before any Democratic officer appeared. The trial court accepted the evidence of Mr. Maloney as being more accurate as to the time at which the first Democratic officer appeared. We cannot say that he erred in doing so.

The question is then sharply presented whether in such instances the polls may be legally opened at 6 o'clock or whether the election must be suspended until 6:30 unless all of the appointed officers of both parties shall have assumed their duties before that hour.

Section 148 of the Constitution fixes the election hours between 6 o'clock a. m. and 7 o'clock p. m., but provides that the General Assembly may change those hours.

Section 1469, Kentucky Statutes, is as follows:

"The polls shall be opened at six o'clock in the forenoon, and kept open continuously up to and closed at four o'clock in the afternoon of the same day; and before receiving the ballots of any elector, the officers of election shall cause to be proclaimed that such election is opened."

Section 1596a-4 is, in part, as follows:

"Should the county board of election commissioners fail to appoint such officers of election, or if any such officers fail to attend for thirty minutes after the time for commencing the election, or refuse

to act, the officer in attendance representing the same political party of the absentee shall appoint a suitable person to act in his stead for that election; or, if both representatives of the same political party are absent, qualified voters present affiliating with the party of said two absentees shall elect, viva voce, suitable persons to act in their stead.''

It is clearly contemplated that the polls shall be opened promptly at 6 o'clock, thus permitting those who go to work early to vote without inconvenience or loss of time, and also insuring ten hours within which to receive the ballots. It is also clearly contemplated that the officers of election appointed pursuant to section 1596a-3 shall take the oath of office and in accordance with their duty appear at the designated place so that there shall be no delay. A penalty is provided if they neglect their duties or willfully perform them in such a way as to hinder the objects of the election law. Section 1577, Statutes. At the same time the law is equally explicit in its endeavor to insure a fair registration of the will of the electorate that the opposing political parties shall be represented at the opening of the polls and throughout the day. Section 1468, Statutes, declares that the officers of election, before the voting begins, shall see that there are no ballots in the box, ''and shall thereupon securely lock the box and give one key to each of the judges.'' To permit the officers of one party only to open and conduct the election would violate the spirit, if not the exact letter, of the election laws.

In Hughes v. Roberts, 142 Ky. 142, 134 S. W. 168, Ann. Cas. 1912D, 148, an election was held in a school district under section 4481 of the Statutes (since repealed) to determine whether bonds should be issued. The proceedings of the election were regular, except it was held by two officers instead of four as specially provided. It was conceded that the election was fairly held. Nevertheless, after referring to the well-established rule that irregularities of the officers in the conduct of an election will not render it void and that the holding of an election by persons who had only colorable authority was of that character, the court held the election invalid because it was conducted by only two officers.

Under section 448 of the Statutes, authority given to three or more public officers or persons shall be construed as giving such authority to a majority of them.

The court therefore conclud,es, after carefully weighing the apparently conflicting provisions of the Statutes, that the safer and better reconciliation and interpretation to be placed upon them is to hold that the polls may not open until at least one of the appointed officers of each party shall be present, or if none appears by 6:30 a. m., to proceed to fill the vacancy as provided by section 1596a-4. Therefore, the trial court was correct in deducting such votes cast before the arrival of McGurk, the Democratic election officer, as could be identified.

(b) Confusion existed as to the exact boundary line of the Power House precinct. By the act of the Legislature of 1831, incorporating the city of Lexington, its territory was declared to be that embraced within a circle having a radius of one mile from the center of the courthouse. Some time thereafter stones were placed at various points in the circular line to mark the city limits. Although the limits have been extended from time to time, the circular boundary has been recognized and known as the ''old city limits.'' This line has been maintained in connection with the voting precincts because the Legislature in creating two legislative districts in Fayette county used the old city limits as the boundary between them. The Power House precinct is within this circle and is bounded by the old city line.

In 1912 the city engineer's office of Lexington issued a precinct map showing this circular boundary. Accepting that as correct, the Republican Party workers located it on the ground and made up their pollbooks accordingly. There is evidence also that the Democratic workers regarded that line as being at the same place. At any rate, voters within it were registered at the Power House precinct, some of them for several years past. A few witnesses living in the questioned territory testified officers of election had required them to change their voting place from adjoining districts to this one. After the election involved, the city engineer made up a map which showed the true line to be closer in than that used by the party workers, and he verified that location by going upon the ground and uncovering some of the old stone markers. The result was that a number of those living between the two lines thus established cast their votes in the Power House precinct. The circuit court eliminated such of them as were proven to have voted the Republi-

can ticket. There was no claim made as to any within that territory having voted for the opposing candidate.

The contestant claims this was error, principally because the voters had a right to rely upon the line which he says was established by the map of 1912, and because these citizens had been recognized as voters in that precinct and honestly believed that they were. Fixing of the boundary of precincts is the duty of the county court, and the county court of Fayette county declared from time to time that the boundary of the Power House precinct was the old city line. The act of the city of Lexington in issuing a map showing that line to be other than its actual place could not change the precinct boundary; and under the authority of Nunnelly v. Doty, 210 Ky. 642, 276 S. W. 152, and Stice v. Parsley, 217 Ky. 653, 290 S. W. 471, the court properly held that those residing in this disputed territory were not legal voters in the Power House precinct.

(c) The contestant argues that in no event should the court have charged him with several specified votes upon the ground, principally, that the evidence was not sufficient to show for whom they were cast. We think the evidence was sufficient under the authority of Tunks v. Vincent, 106 Ky. 829, 51 S. W. 622, 21 Ky. Law Rep. 475. But he did err in charging him with the vote of Laura Davis. She voted in Loudon precinct. Her name is not included in the pleadings as an illegal voter in Power House precinct. The error probably arose out of a confusion with Laura Doty or Douglas, whose vote was already charged to contestant as an early voter.

However, contestant's gain of this one vote is offset by our decision that he should have been charged with Elizabeth Nelson. She had not lived within the state the prescribed length of time.

We have given full consideration to the contestee's claim that several other votes should have been charged to the contestant, but conclude the trial court ruled correctly in regard to them.

The result of the foregoing is to reduce the certified vote in Power House precinct from 191 to 165 for Charles Land, and from 28 to 27 for Porter Land.

III. It is claimed in the counter contest that 16 votes were polled for the contestant in North Upper precinct after 4 o'clock, and that they should be deducted from his total.

In the early case (under the present system of voting) of Banks v. Sergent, 104 Ky. 843, 48 S. W. 149, 20 Ky. Law Rep. 1024, it was held that the provision in the statute for the closing of the polls at 4 o'clock was mandatory, and that if it clearly appeared that votes sufficient to affect the result were cast after that hour and it could not be ascertained for whom they were cast, and therefore deducted, the precinct should be thrown out. And in Cowan v. Prowse, 93 Ky. 157, 19 S. W. 407, 409, 14 Ky. Law Rep. 273 (held under the viva voce system), it is written:

> "As testimony about a question of time is uncertain and conflicting, especially when reckoned by minutes, a court should not take cognizance of such matter except when there has been a palpable or flagrant disregard of the law by officers which is not made to appear in this case."

The watches of several officers present varied materially, and as the trial court found and wrote:

> "The officers of election did a practical thing. They took the time as shown by the watches of both King and Brittingham—one a Democrat and one a Republican, and determined that the correct time was the average between the two. Three voters were in the box and thirteen more were called in, and all of these were voted before the time as arrived at by the average had elapsed, and four or five minutes before four o'clock, as shown by the watch of Brittingham, and the polls were open by the time as shown by his watch. The law contemplates that the polls remain open ten hours and they remained open for four or five minutes less than the time. Not a single officer made any objection to the procedure in arriving at the correct time to close the polls. Not a single voter was challenged, and no complaint was made at the time by any single officer or challenger, Republican or Democrat, that the polls were not closed on time.

While it appears that the letter of the law as to the number to be admitted at one time was not followed, it does not appear that the secrecy of the ballot was violated and no one could have been prejudiced. Neither does it clearly appear that any votes were cast after 4

o'clock. The action of the trial court in denying the prayer of the counter contestant as to this precinct was proper.

No complaint is made of the deduction of one vote (Lillian Withers) in this precinct from Charles Land on another ground.

IV. The contestee charged in his counterclaim that in the Chilesburg precinct there were such irregularities and violations of the election laws as to render the election invalid and make it necessary to throw out the vote of the entire precinct. The election was held in a room about 15 by 20 feet in size and the voting booths were placed by two windows. The table on which the voting was done was practically flush with the glass in the windows. The evidence indicated that one standing on the outside close to the window could see how the ballots were being voted. About 9 o'clock some newspapers were placed over these windows, but one of them fell off in a little while and was not replaced. The officers testified, however, that they saw no one looking through the window so as to detect how the ballots were being stamped. It was testified that John Barker, a Republican worker, talked to certain colored voters before they entered the polls and then stood in such a position on the outside as to see them mark their ballots, and in one instance took a voter after he came out behind a building and that voter said he had gotten $5 out of it. All this was denied, except that the workers testified that with the use of sample ballots they showed a number of people how to vote.

There was some evidence also that others than the election officers were in the voting place at the count and perhaps assisted in making it. The trial court refers to the standing and unquestioned integrity of Mr. Barker and other witnesses introduced by the contestant regarding the occurrences at the polls, and gives great weight to their evidence.

The election in this precinct was not conducted in strict accordance with the law, but it does not clearly appear that the departures were of such a nature as to justify throwing out the entire precinct, and we concur in the action of the lower court in refusing to do so.

V. We shall group consideration of numerous votes in several precincts and only give our conclusions respecting them, without assigning the reasons except in

a few instances as the trial court has expressed them in his opinion, which is of course available to the parties.

The contestee concedes that the trial court was correct in deducting 17 votes from the total. He questions the correctness of deducting several others to be named.

The court properly deducted from the contestee the vote of Haywood McCormack as an open voter at Mt. Horeb.

It is alleged that Elijah Miller, a convicted felon who had not been restored to citizenship, had voted for the contestee in Bell Schoolhouse precinct. There was no proof of that fact, but the court charged him to the contestee because he had voted openly for him. On account of the variance between the pleading and proof, his vote should not have been deducted, and we restore it to Porter Land.

With reference to Owen Laughlin, Mrs. Owen Laughlin, Thomas Hadden, Walker Griffin, Mary or Mollie Griffin, Will Hobbs, Elbert Chatman, Sylvester Clay, and Luther Hager or Hays, all charged to contestee, it is argued by him that the court erred in deducting them because the allegation of the petition that they had not been residents of the county and of the precinct a sufficient length of time to entitle them to vote is a mere conclusion of law and not a statement of fact, or because the evidence was taken after January 29, 1930, when the time which contestant had for taking proof had expired. The petition in the respect criticized does not meet the technical requirements of good pleading, but it does put the contestee on notice that the votes of these persons were called in question because they did not have an actual residence in the county for six months and in the precinct 60 days before the day of the election. The evidence was taken under an extension of time granted by the lower court, and we have held that where the exigencies of the situation indicate that a denial of indulgence would be a virtual denial of justice and a deprivation of the right of a party to present his cause to the court, the court may, in the exercise of reasonable discretion, extend the time for taking proof. There was no abuse of discretion in this instance. We approve the deduction from the contestee of 7 of the named votes, but conclude that error was made in charging him with the votes of Hadden and Mary Griffin. The proof was sufficient to show that Hadden had a legal residence in Kirkleving-

ton precinct. There was no proof as to how Mary Griffin had voted.

The evidence was clear that W. J. Norton, the Democratic clerk in Preston Inn precinct, flourished and exposed his ballot in an exhibition of pride in having voted the straight ticket. The circumstances were sufficient to prove that he cast his vote for the contestee, and the trial court should have charged it up to him.

The contestee questioned the right of Ernest De Haven to vote in Forest Hill No. 1 precinct, on the ground that he was a nonresident. His nonresidency was established, but De Haven testified that he voted the straight Democratic ticket, and under the authority of Drennan v. Roberts, supra, the vote should have been charged to the contestee. The lower court does not refer to this voter in his opinion.

No question is raised as to the correctness of deducting from Charles Land the following votes in Chilesburg precinct: Joseph Wartenberger, George Shanks, Mrs. George Shanks, and Bill Townsend.

The court properly charged the contestant with the votes of Steve McDowell and Sam McDowell in Jack's Creek precinct, and Mrs. Tom Berkley in Chilesburg precinct. The evidence shows the legal residence of the McDowells to have been on the farm of Charles Land in Jessamine county; and Mrs. Berkley's to have been where her husband's legal residence was in Clark county.

Perry Robinson, a convicted felon, voted in Fayette Park precinct. He refused to testify how he had voted upon the vigorous objection of counsel for contestant, who were instrumental in having him do so. The circumstances were sufficient to authorize the conclusion that he voted for Charles Land, and the court properly charged the vote to him. Geo. Ballard, Eliza Ballard, Kate Miller, and Power West voted for contestant in Chilesburg precinct. Ed Munich voted for the contestant in Madison Place No. 1. Tommie Williams and Beulah Ingram voted for him in Kinkead precinct. None of these people resided in the respective precincts, and the court properly charged their votes to the contestant.

On account of no pleading to cover or no proof of how they voted, the court properly refused to deduct the votes of George Laughlin, W. H. Thompson, John Chil-

ders, Mary Childers, Palestine White, Dr. Sayre, Howard Childers, D. H. Perry, Jess Hunt, Henry Whalen, Mrs. Henry Whalen, Ray Perkins, Mrs. John Webb, N. S. Jennings, Chap Pollard, Owen Saxton, W. C. Cooper, Mrs. Matt Clay, and Ruth McMonigle.

A summary of the foregoing shows the court deducted 42 votes from Charles Land, all of which stand approved; that he deducted 29 votes from Porter Land, and we deduct 28 from him.

VI. In his petition the contestant asked for a recount of the ballots in 30 named precincts. He also alleged in a general way that there were many others in which mistakes and irregularities had occurred and in which the ballots should be counted. On a motion to make more specific and definite the allegations of the petition, the contestants by an amended petition specified numerous other precincts, which included several of those named in the original petition.

During the progress of the trial he moved the court to go to the ballot room and there examine the condition under which the boxes had been kept, and moved again that the ballots be recounted. The court visited this room and examined its condition, as well as the condition of the boxes, and upon the evidence heard and his inspection of two boxes he overruled the motions and prayer for a recount.

The evidence respecting the integrity of the ballots, in brief, was this: One or more election officers from each precinct testified to a strict compliance with the law as to the manner in which the ballots, stubs, etc., should be handled, and to the delivery of the boxes on the evening of election day to the county clerk. Because of illness Faust Foushee, the county court clerk, left the reception of the boxes to his nephew and deputy, Coleman Foushee. The boxes were delivered to him, and he and other deputy clerks testified to having performed the duties of the clerk in opening the boxes, taking out the stubs and questioned ballots, examining the others, and delivering the keys to the respective election officers, as is provided by law. The boxes were then put on the elevator, and as it became loaded they were taken by two colored porters to the fourth floor or attic of the courthouse, where they were unloaded and moved by two other porters into the ballot box room.

The south side of that room was the front wall of the courthouse. The north wall was of brick without any opening therein. The east and west walls were constructed of corrugated galvanized iron sheets reaching from the ceiling to the floor and fastened together with wire. Except the outside dormer windows of the courthouse in the south wall of this room, the only opening into it was a door 26 inches wide by 4 feet 11 inches in height made of galvanized iron. This door was fastened with a hasp placed about its center and locked with a ten tumbler Corbin lock, which the testimony shows is the best made.

As the last box was delivered to the deputy clerk by the election officers, about 11 o'clock, he accompanied the porter on the elevator, and having seen it placed in this room, then locked the ballot room door with this lock, and retained the key until he delivered it to Mr. Foushee, the clerk.

There were only two entrances to the fourth floor, the elevator and a stairway. After concluding the work of taking up the boxes, the elevator was left in the basement, the current cut off, and it was locked. The key to the stairway was delivered to a deputy sheriff by the custodian of the building.

About the time this last box was delivered on the fourth floor, Colston Blackburn, a deputy sheriff, pursuant to directions of E. H. Fuller, sheriff (who was the Republican candidate in that election for county clerk in opposition to Mr. Foushee), went to the fourth floor, as he says, to guard the ballots. It is in evidence that a few minutes afterwards he came down the stairway to the third floor and called for one of the porters to tell W. R. Wallace, another deputy sheriff, to send a Democrat up there to guard with him. Instead of doing so, Wallace, who is also a Republican, went to the fourth floor. These two deputy sheriffs remainded up there by themselves until some time about 2 o'clock in the morning, when Blackburn came down to get a lunch, as he testified. Sitting on the stairway between the second and third floors of the courthouse during the night were several friends and members of Porter Land's family, who had established themselves there in order to see that no one went to the ballot room. It seems also that a brother of the contestant for a time sat on the third floor near the elevator, as he says, in order to see that no one went

to the fourth floor. When Blackburn came down the steps the other group were much surprised. They learned that the other deputy sheriff was up there. Both groups kept watch the remainder of the night, and thereafter the room was continually guarded by representatives of both parties.

The colored porters all testify that they did not molest the ballots while handling the boxes, and the two deputy sheriffs also swear positively that they did not go near the ballot room door or endeavor in any way to enter the room, but remained outside during the whole time. The corner of the metal door into the ballot box room was found by the contestee's friends, when they went up there that night, to be sprung 8 or 10 inches, and there was some testimony that any one could have gone through that door; but this was effectually disproved, not only by a physical examination of the door, but when the court directed that a witness, who had testified that he or any one else could go through the door, should endeavor to do so (which was later modified as optional with him), he declined on advice of counsel to undertake the test. The next morning another hasp and lock were placed on the upper corner of the door.

In addition to having a minute description of the condition of the room and the boxes, the court, with counsel, as stated, inspected them and he put into the record his own description. The trial court was satisfied, and we are satisfied, that this room had not been entered after the deputy clerk locked it when the last box was placed there the night of the election. Several boxes were found not to be in the tiers or stacks but in another portion of the room. There was a statement by one of the porters that they had been moved from where he had placed them that night, but not only did this witness contradict and impeach himself, but the weight of the evidence is that those boxes were where they had been all the time. They were the first ones taken to the room, and it appears that the men had started stacking the boxes in that part of the room, but on suggestion that it would be more convenient to place them elsewhere, they changed their plan and stacked the others against another wall. The court opened two of these boxes, and finding that the ballots in them were not tied and sealed or otherwise preserved as the law requires, accompanied by the fact that keys were attached to some of the boxes

instead of having been returned to the election officers, and the further fact that the locks were the cheapest available and easily opened, with numerous keys in and about the room, together with the presence of an ample supply of seals, stencils, etc., the court refused to open other boxes and to count any of the ballots. His decision was based upon the possibility of their having been tampered with during the intervals when the elevator was being loaded on the first floor, there being five, ten, or possibly fifteen minutes intervening between each trip. From the evidence before him and, as he states in his opinion, from his personal knowledge of the two deputy sheriffs referred to, and his confidence in them, the court was satisfied they had not entered the ballot room.

VII. 1. After considering all the evidence respecting the maintenance of these ballots from interference up to the time the circuit court declined to recount them, this court has had brought before it 50 ballot boxes, on a motion for a subpeona duces tecum made by the contestant, first for inspection and determination whether the ballots should be counted.

In Phillips v. Kincaid, 194 Ky. 750, 240 S. W. 737, 738, it is written:

"And it should be observed here that cases may arise in which that question [as to counting the ballots] cannot be decided until the ballot boxes are opened and the ballots themselves inspected, and other cases in which their admissibility should be allowed, but their evidential effect depreciated. . . .

"It is incumbent, as we have seen, upon the party asking for an inspection of the ballots to show that their rectitude had not been impaired: but the requirement is reasonable and he should not be compelled to do more than prove circumstances and facts naturally and logically inducive of that inference."

Beginning with the foundation case of Edwards v. Logan, 114 Ky. 312, 70 S. W. 852, 75 S. W. 257, 24 Ky. Law Rep. 1099, 25 Ky. Law Rep. 435, the rule has been followed that where the ballots are shown to have been preserved so that their identity and integrity are assured they will be recounted by the court and accepted as the better evidence of the expressed will of the voters, and where there is a variance from the returns of the election officers, the recount will prevail. The difficul-

ties that have arisen have come from doubt as to the certitude or integrity of the ballots. Eliminating from our opinions observations and arguments, and looking to the essential things which give to a judicial opinion authoritive influence and controlling force, namely, what the court decided on the given facts, it will be found that where the boxes themselves have been reasonably secured from interference—although they are insecure by reason of their construction or insufficient locks or other fastenings—the court will look into the contents and permit each box to speak for itself.

The law has made minute provision as to the manner in which ballots shall be maintained and preserved, and if those provisions have been substantially followed, it would be impossible for any one to change or tamper with the ballots without it being disclosed; and when they have been opened up and an inspection and comparison made with the stubs, certificates, etc., we have no doubt that such internal evidence will prove or disprove the virtue of the ballots. The details prescribed for the care of the voted ballots mean something, and, unless they have been complied with to such degree and extent as to safeguard the ballots from interference without disclosure, the court cannot afford to ascribe to them such verity as will overcome the presumption that the election officers performed their duty in correctly counting and reporting the result. We are not unmindful of the conditions under which the count of ballots is usually made at the close of an election. Judging by experience, there are but few election officers who comply even substantially with the law referred to. So it will not do to say when it is reasonably proved that the boxes have been safeguarded that, because some of the ballots cannot meet the test of preservation, none of them should be considered. When the stage has been reached that the court may safely go into the boxes for evidence of their integrity, it may be said, to change a homely expression, that every box must stand on its own bottom. See Browning v. Lovitt, 139 Ky. 480, 94 S. W. 661, 29 Ky. Law Rep. 692, where on a recount the court accepted the officers' returns in certain precincts where the ballots showed evidence of their having been tampered with, and accepted the result of the recount in others. Recent cases in which the subject of recounting ballots was before this court are: Covington v. Joiner, 200 Ky. 378, 254 S. W.

1048; Hicks v. Kimbro, 210 Ky. 265, 275 S. W. 814; Ferguson v. Gregory, 216 Ky. 382, 287 S. W. 952; Roby v. Croan, 177 Ky. 9, 197 S. W. 456; Phillips v. Kincaid, supra. These refer to many prior opinions, all of which need not be cited here. We would, however, refer as being of particular application the following: Edwards v. Logan, 114 Ky. 312, 70 S. W. 852, 75 S. W. 257, 24 Ky. Law Rep. 1099, 25 Ky. Law Rep. 435; McEuen v. Carey, 123 Ky. 536, 96 S. W. 850, 29 Ky. Law Rep. 931; Cole v. Nunnelley, 140 Ky. 138, 130 S. W. 972; Morgan v. Sparkman, 143 Ky. 27, 135 S. W. 408; Lester v. Fogarty, 99 S. W. 910, 30 Ky. Law Rep. 759; Hackney v. Justice, 159 Ky. 167, 166 S. W. 760; Potter v. Campbell, 159 Ky. 328, 167 S. W. 404; Snowden v. Flanery, 159 Ky. 568, 167 S. W. 893.

2. The members of this court have patiently scrutinized the condition of these ballots and counted every one of them. Although in but few instances did we find that the provisions of the law with respect to the manner of preserving and returning the ballots, etc., had been strictly complied with, we are reasonably convinced from the results of comparison with the returns certified and other considerations that they had not been tampered with. The condition of the ballots ranged from being in the boxes loose to being preserved in strict compliance with every detail provided by law. In twelve boxes in which the ballots had been very carelessly preserved our count was exactly the same as that of the election officers. In other boxes our count varied a few votes, some favorable to the contestant and some favorable to the contestee, but only such as might be expected. But on account of the fact that there had not been a substantial compliance with the law respecting the manner of preserving the ballots, the court is of the opinion that a recount of the ballots in this lot ought not to overcome the regularity and presumed accuracy of the officers' returns. It may be well to refer to two instances in this group where there was a material difference.

In the Power House precinct (where the officers testified to a mistake in certifying the vote), we found that Porter Land received 19 instead of 28 votes, and Charles Land received 187 instead of 191. But there had been but little effort made to comply with the law as to stringing, sealing, and placing the ballots in the envelope and properly sealing it, with the names of the officers

written across the flap, and we have therefore not taken into consideration the difference in the votes thus developed, but have accepted as correct the returns as certified. In the Race Track precinct the ballots were folded and merely threaded on a string, although the envelope in which they were placed was properly sealed and signed. There was found to be running through every race a large difference. In the sheriff's race, a recount showed Charles Land received 161 instead of 146 votes, and Porter Land received 95 instead of 104 votes, the net gain for the contestant being 24 votes; and while it would seem from a comparison with the number of ballots issued, as shown by the stub, that our recount discloses the correct result of the voting, we cannot get away from the fact that there was no proper preservation of the ballots, and therefore we take the returns certified by the election officers.

But in Rosemont No. 2 precinct, we found the law had been complied with in every detail, save only that there was no seal on the string on which the ballots were strung and with which they were bound and tied. A clear discrepency was found between the recount and the officers' returns in the sheriff's race. The court has weighed carefully many conceptions of possible tampering and irregularity, and, having done so, has reached the definite conclusion that there was an honest error made by the officers of the election. And since the law has been so strictly complied with and the certitude of the ballots so clearly established, we further conclude that the result of the recount should be accepted in lieu of the officers' returns. The certificate shows 93 votes for Charles Land; we find he received 123. The certificate shows 182 votes for Porter Land, and we find he received 160. There was therefore a net gain of 52 votes for the contestant.

In the following precincts the degree of compliance with the law in preserving the ballots was such as to give verity to them, and we accept the result of our recount as correct: In Aylesford, Charles Land received 107 instead of 108. In Madison Place No. 1, Porter Land received 135 instead of 132 votes. In Woodland No. 1, Porter Land received 160 instead of 161. In Kenwick No. 3, Charles Land received 94 instead of 91 votes, and Porter Land received 75 instead of 73. In South Upper precinct, Charles Land received 65 instead of 66 votes,

and Porter Land received 133 instead of 130 votes. In Fairground precinct, Charles Land received 141 instead of 143; Porter Land received 123 instead of 122 votes.

VIII. After giving full consideration to the foregoing conditions and results of the recount, the court concluded that before the results should be finally adopted it should be advised as to the manner in which the ballots had been maintained during the interval between the time the trial court declined to recount them and the date they were delivered into the custody of the officers of this court. Thereupon an order was entered permitting the parties to take depositions respecting the matter and file them here. Considerable evidence was so taken.

It is shown that the ballot box room referred to had been kept locked with two locks, the key to each of which had been kept by the circuit judge and circuit clerk, respectively—the one a Republican and the other a Democrat—and a continuous guard maintained up to March 3, 1930. The fiscal court had ordered the room to be made more secure, and on that day work began. The parties to this contest agreed on a guard for duty during the period of the work, and an order was entered by the court naming him and explicitly defining his duties. He was administered an oath of fidelity to his trust. All the keys to the room, however, were kept by the circuit clerk who admitted the workmen under the watch of the guard. There is some evidence that for a brief time the keys were in possession of the guard instead of the clerk, and for a greater period during working hours he had possession of the key to the stair door leading from the third floor. It was established that this door was kept locked during the progress of the work. All keys were in the custody of the clerk during the night. It was only for a few hours that it was necessary to admit workmen within the ballot room during the entire time they were engaged. Their labors were completed within a week, and the clerk and guard appointed by the court filed reports of faithful discharge of their respective duties under the order.

The contractors and all workmen engaged, as well as the guard, testified positively that the ballot boxes and contents had in no manner been disturbed. One of the colored helpers, however, testified that the guard had had the keys to the ballot room and not the circuit clerk; and there were statements introduced contradicting some

of the witnesses who had testified that the clerk and not the guard admitted them into the room and had the keys to it. And the correctness of the transcript of the depositions along the same line was brought in question. It should be said the circuit clerk who was thus concerned died the latter part of July, 1930, which was long before this line of evidence was taken. Whatever may have been the case, no one testifies to anything other than that the ballot boxes were not molested during the brief period.

Iron bars were placed across the windows of the room and a re-enforced concrete and plaster wall put on and around the galvanized iron wall already described. A new door suitable to such a wall was installed. The room was converted into a secure vault, impregnable save by the use of powerful tools, which, of course, would have disclosed an invasion. The guards were thereafter removed and custody of the keys returned to the judge and clerk.

No claim is made of any violation or possibility of violation of the ballots during the interval, except that the contestee urges that there was opportunity therefor while the work on the room was in progress and the keys were in the possession of the guard. The ground for suspicion, however, was overcome by positive and uncontroverted evidence that they were constantly under surveillance and not molested.

The court has given full consideration to every detail of the evidence submitted under its order, and reaches the conclusion that the ballots were properly preserved during the period involved.

IX. The court, therefore, adopts as final the recount made as above stated.

A recapitulation of our findings in the matter of illegal votes or voters (those not involved in the recount) shows that 42 votes are to be deducted from the total vote of Charles Land (10,734), and 28 votes from Porter Land's total (10,737), thus giving Porter Land a majority of 17 votes. Taking into consideration the net gain of Charles Land, as shown by the recount, namely, 43 votes, it would result that Charles Land received a majority of 26 votes.

The judgment is accordingly reversed, with directions to enter a judgment in conformity with this opinion.

Whole court sitting.

150

CLAY and RICHARDSON, JJ., dissenting.

CLAY, J. (dissenting).

I dislike to dissent in a case like this, but as I know of no way to decide cases except to apply well-established principles of law to the facts, regardless of whom it affects, or of what others may think, and the majority opinion is a radical departure from that rule, there is no other alternative.

On the passage of the act providing for the preservation of ballots, we adopted in the case of Bailey v. Hurst, 113 Ky. 699, 68 S. W. 867, 869, 24 Ky. Law Rep. 504, the following rule from section 471 of McCrary on Elections, which is peculiarly applicable to this case:

> "Where, as is the case in several of the states, the statute provides a mode of preserving the identical ballots cast at an election, for the purpose of being used as evidence in case of contest, such statute, and particularly those provisions which provide for the safe-keeping of such ballots, must be followed with great care. The danger that the ballots may be tampered with after the count is made known, especially if the vote is very close, is so great that no opportunity for such tampering can be permitted. Such ballots, in order to be received in evidence, must have remained in the custody of the proper officers of the law from the time of the original official count until they are produced before the proper court or officer; and if it appear that they have been handled by unauthorized persons, or that they have been left in an exposed and improper place, they cannot be offered to overcome the official count."

Six months later we quoted with approval in Edwards v. Logan, 114 Ky. 313, 70 S. W. 852, 854, 75 S. W. 257, 24 Ky. Law Rep. 1099, 25 Ky. Law Rep. 435, the following from People v. Livingston, 79 N. Y. 288:

> "After the election it is known just how many votes are required to change the result. The ballots themselves cannot be identified. They have no earmark. Everything depends upon keeping the ballot boxes secure, and the difficulty of doing this for several months, in the face of temptation and opportunity, requires that the utmost scrutiny and care

should be exercised in receiving the evidence. Every consideration of public policy, as well as the ordinary rules of evidence, require that the party offering this evidence should establish the fact that the ballots are genuine. It is not sufficient that the mere probability of security is proved, but the fact must be shown with a reasonable degree of certainty. If the boxes have been rigorously preserved, the ballots are the best and highest evidence, but, if not, they are not only the weakest, but the most dangerous, evidence.''

This rule has been consistently followed in all subsequent cases. Thus in Thompson v. Stone, 164 Ky. 18, 174 S. W. 763, 764, the court, after referring to the authorities, said:

"So in this case the question is whether unauthorized or interested persons have had opportunities to tamper with them [the ballots]. If so, then the lower court properly declined to open the boxes and count the ballots.''

In support of his motion for a recount in that case, the contestant filed his affidavit showing that the ballot boxes were placed in the clerk's office where persons were accustomed to work at night, but stating that the affiant did not charge or say that the parties so using the office had tampered with, or had any intention of tampering with, the ballot boxes. Before passing on the motion the court heard the testimony of the clerk and his deputies, and their evidence corroborated the affidavit. In holding that the circuit court properly declined to consider the ballots the court said:

"The affidavit discredits the integrity of the ballots, for it is apparent that there was every opportunity to tamper with them.''

In Browning v. Lovitt, 139 Ky. 480, 94 S. W. 661, 663, 29 Ky. Law Rep. 692, we held that:

"When a recount is demanded and made, if the box appears to have been opened since its delivery to the clerk by the officers of the election, or if the ballots show evidence of having been tampered with, the court should reject them, and accept the certifi-

cate of the officers of the election as the correct vote in the precinct.''

On the other hand, in Rich v. Young, 176 Ky. 813, 197 S. W. 442, we held that, although the inspection of the ballot box upon its tender in evidence by the legal custodian showed no indication that it had been tampered with, this was not sufficient to warrant a recount of the ballots unless there was clear and convincing proof that the ballot boxes and the ballots had ''been rigorously preserved.'' The rule deducible from these authorities and others that might be quoted is that, before recourse may be had to the ballots to overcome the certificate of election, (1) it must be clearly and satisfactorily proved that the ballots have been rigorously preserved, and (2) there must be no internal evidence of tampering. Hence, if either element is lacking a recount may not be had.

The circuit judge, who was on the ground, understood the conditions, was familiar with the setting, and knew the witnesses, held after a long hearing that there was abundant opportunity for tampering with the ballots, and thereafter inspected two of the ballot boxes and found their conditions altogether different from that described by witnesses introduced by the contestant as existing at the time of their delivery. It further appeared on the hearing that the locks on the boxes were 10-cent locks and insecure; that in some instances the keys to the box were tied with strings on the outside of the box; that other keys were easily accessible; and that in numerous instances election seals, stencils, ink, pads, and sealing wax were all left in the ballot boxes at the time they were returned to the county court clerk's office. On examining the authorities and finding that in no instance had this court upon such a showing approved or ordered a recount of the ballots, the circuit judge declined to go into the ballot boxes, and the matter should have ended there.

But if anything more were needed to confirm the soundness of the conclusion reached by the circuit judge, it developed on the inspection of the ballot boxes by the members of this court. The locks were insecure and such as could have been easily opened by any interested person. In the boxes were stencils, pads, seals, and all the facilities for changing the result. Although the officers testified that the ballots were properly strung, tied,

sealed, and inclosed in envelopes which were likewise sealed and indorsed by the officers (which evidence the court disregarded on the unsubstantial ground that the witnesses may not have remembered correctly the most important feature of the election, the certification of the result), the condition of the ballot boxes and ballots was as follows:

In 1 box there were no ballots.

In 1 box the ballots were 11 short.

In 4 boxes the seals on the envelopes had been broken.

In 21 boxes the names of the officers were not written across the flaps of the envelopes.

In 7 boxes the ballots were loose.

In 12 boxes there were no seals on the envelopes.

In 13 boxes the ballots were not properly strung or sealed.

Not only so, but the difference in every race between the original count and the recount in the Race Track precinct is such that it cannot be accounted for on the theory of mistake or collusion on the part of the election officers, challengers, and inspectors. On the contrary, the only reasonable explanation of the difference is that the ballots were tampered with after the election. It is true that on account of the condition of the ballots the court declined to give effect to the recount, but the precinct is mentioned because the ballots themselves, considered in connection with the official returns, furnish strong internal evidence of having been tampered with. Thus we have the following elements: (1) Opportunity for tampering by interested parties; (2) facilities for tampering; (3) internal evidence of tampering; (4) a result different from that certified by the election officers. Manifestly, where such a situation prevails, the ballots themselves "are not only the weakest, but the most dangerous evidence," and therefore are not sufficient to overcome the official returns.

But, notwithstanding the opportunity and facilities for tampering by interested persons, as well as internal evidence that some of the boxes had been tampered with, the majority of the court, taking the position "that every box must stand on its own bottom," and that they detected no evidence of tampering with the ballots in Rose-

mont Precinct No. 2, have counted the ballots in that precinct and made the whole election turn on the recount. This was done in the face of uncontradicted evidence that the keys were tied on the outside of the box, that the box contained all the paraphernalia for holding an election, and that in the other races there was a variance of only 1 or 2 votes between the recount and the original count, whereas the discrepancy in the sheriff's race amounted to 52 votes, which could have been due only to fraud on the part of interested persons after the ballot box was returned to the courthouse, or to a mistake or conspiracy on the part of all the election officers, challengers, and inspectors—a situation wholly improbable in view of the hotly contested character of the election and the number of interested persons present.

The action of the majority finds no support in Browning v. Lovitt, supra. There the contestant asked a recount of the ballots, which was granted. On reaching precinct No. 13 it was found that the ballots had been stolen. On reaching precinct No. 23 it appeared that the ballot box and ballots had been tampered with. The trial court accepted the certificate of the officers in precinct No. 13, but threw out the vote in precinct No. 23. On appeal it was held that the lower court should have accepted the certificate of the officers in precinct No. 23, as well as precinct No. 13. The propriety of the court's action in counting the ballots in the other precincts was not raised by either party, or considered on appeal.

On the other hand, the precise question was involved in Hicks v. Kimbro, 210 Ky. 265, 275 S. W. 814, 817, where it appeared that the seals and supplies had remained in the ballot boxes, that the county court clerk kept the keys in an unlocked drawer, that the ballot boxes were easily accessible, and that two of the boxes had been rearranged. The court did not go into the ballot boxes and count the ballots in any particular box on the ground that they appeared to be all right but upheld the action of the trial court in refusing to count any of the ballots. In reaching this conclusion the court said:

"The evidence in this case discloses that none of the safeguards provided by our statutes to guard the sanctity of the ballots were observed. The ballot boxes, the keys to their locks, and the election seals were all left in and about the clerk's office. Any one

acquiring access to the clerk's office had every opportunity to open the ballot box, to open the envelope containing the ballots, and to remove the string with which they were bound, to change as many ballots as needed to change the result of the election, and then to rebind and reseal and reinclose them in the envelope, and reseal it and lock the ballot box in exactly the same manner as those things had been done by the officers of the election, because they had possession of exactly the same implements and supplies used by the election officers in preparing the ballots originally to guard against their being tampered with.''

In the more recent case of Ferguson v. Gregory, 216 Ky. 382, 287 S. W. 952, the court, upon evidence that the ballot boxes were insecurely locked, were accessible to interested persons, and that the stub books that had been placed in two of the city precinct boxes had been removed therefrom, approved and applied the rule announced in Hicks v. Kimbro, supra, and refused to count the ballots in any of the boxes although it appeared that the officers of the election complied with all the statutory requirements as to stringing and sealing the ballots, and inclosing them in properly sealed and indorsed envelopes. The majority opinion overrules these two cases, although it is at once apparent that their soundness is beyond question. It is not to be presumed that those who tamper with ballots for the purpose of contest are going to be so crude in their work as always to leave internal evidence of such tampering. Where opportunity and means of tampering concur with actual tampering, the courts should stop there and go no further. Where, as here, the ballot boxes have been kept together, it will not do to measure with nicety the extent of the tampering and speculate on whether this box or that box was tampered with. Otherwise the courts will be in a position of matching wits with those who tamper with ballot boxes, with the result that they will often come out second best and give effect to an election held after the polls were closed.

There is another phase of the court's action that cannot be overlooked. In Edwards v. Logan, supra, we held that, after the lower court had concluded to examine the ballots, it was error not to permit the contestee to offer evidence bearing on their integrity. Inasmuch as

the circuit court refused in this case to count the ballots, it was not necessary for the contestee to introduce the officers, challengers, and inspectors in Rosemont precinct No. 2. The value of this evidence was appraised in Hamilton v. Young, 81 S. W. 682, 685, 26 Ky. Law Rep. 447, where the court used the following language:

"The election officers in their testimony, and by their certificates made at the close of the polls on the day of the election, state that the straight Democratic ticket received 103 votes in East Fork precinct and 136 in Randolph precinct. By the recount of the court it is made to appear that the election officers overlooked one-fourth or 23 stencil marks in the squares opposite appellee's name in East Fork, and 14 in Randolph precinct, and the ballots show that no stencil marks were overlooked by the officers in any other race on any other ticket. This fact, together with the further fact that there is no proof or even suspicion that the election officers acted either negligently or corruptly, is sufficient to create a strong presumption, if, indeed, it is not conclusive proof, that the additional stencil marks found on the recount are, to quote the language of counsel, the product of fraud on the part of either interested parties or corrupt partisans."

In Phillips v. Kincaid, 194 Ky. 750, 240 S. W. 737, 738, so strongly relied on in the majority opinion, the court, though of the opinion that the ballots had been properly preserved, did not count the ballots or remand the case to the circuit court with directions to give effect to the recount. On the contrary, it pointed out that the recount might or might not be conclusive, and remanded the case with the following directions:

"On the return of this case, if the ballots in these precincts have been preserved and safeguarded since the rendition of the judgment, the trial court will open the boxes, and if the ballots appear to be regular and legal they will be admitted in evidence, and considered in connection with all other evidence in determining the claims of the parties to this litigation."

In this case the court has made the recount conclusive, although the contestee might have shown by the election officers, challengers, and inspectors, that the

votes were carefully and correctly counted as cast, and that there was no mistake nor fraud in the certified result. In short, it has adjudged contestee's rights without giving him an opportunity to offer evidence which he was entitled to introduce, and which might have had a controlling effect in the decision of the questions involved.

There being no basis for the recount, and it being conceded that, without the recount, the contestee received the majority of the votes, the judgment should have been affirmed.

I am authorized to say that Judge RICHARDSON concurs in this dissent.