# Wright v. Frazier et al.

December 16, 1949.

J. Ervin Sanders and Harry M. Caudill for appellant.

Stephen Combs, Jr. and Emmett G. Fields for appellees.

STANLEY, COMMISSIONER—Reversing.

In due time Charlie Wright petitioned the court to recount the ballots cast in the November, 1949, race for county court clerk of Letcher County. The election commissioners had found his Republican opponent, Troy Frazier, had received a majority of 54 votes. After hearing evidence concerning the integrity of the ballot boxes, the court reached the conclusion, by reason of an occurrence on Sunday night, November 13, that the ballots may have been tampered with and refused a recount.

There had been some confusion in the keys to the boxes when the election commissioners started to count the ballots on the day of the election, and it had become necessary to cut some of the locks on some of the boxes in order to get into them. When they were closed after the ballots were counted, most of the boxes had two locks and a few one lock on the lids instead of three as provided for. Much is said in the evidence concerning this, but we do not think it is at all significant since there is no evidence tending to contradict the clerk as custodian of the boxes that they were locked and stored in the vault of his office. Neither he nor his deputies had any key to fit the ballot box locks, so there is no evidence

of insecurity of the ballots so far as the locks on the boxes are concerned.

It is very satisfactorily shown that after the count of the absentee ballots on the afternoon of Saturday, November 12, the boxes were placed in the vault of the county clerk's office and it was kept locked with a combination lock except during the business hours, when the interior was under constant surveillance by the clerk, his deputies and the public. It is likewise proved that the door to the office was carefully fastened at the close of business each afternoon with a Yale lock. The clerk was in his office for a brief time the following Sunday afternoon to get his newspaper but did not enter the vault. He saw nothing out of order.

On that Sunday night Troy Frazier's wife and daughter were on watch in an automobile parked in the rear of the court house at such a place that they could observe the outside door and, as they testify, through the glass in it could see the door from the clerk's office into the hall or lobby of the court house. Mrs. Frazier testified, "A few minutes after she (the daughter) got in the back seat of the car, I heard a jarring noise in the Clerk's office and I raised up in my seat and put my eye right on the Clerk's office door and Robert Collins come out of the Clerk's office door and then he come out of the back door of the court house. The court house door can be opened from the inside but it can't from the outside for we tried it when we first parked there, and when he come out he recognized the car that was parked there, he pulled his hat down over the side of his face where I could see him, and come down the steps." Elaborating, Mrs. Frazier related that "when I heard that jarring noise I raised clear up so I could see;" and, further, that the man "managed to get the door of the clerk's office together without any noise to amount to anything at all but the outside door he didn't lock it and that is how we could get inside the court house hall." In cross-examination, the witness stated that it was "some time" after hearing the "jarring noise" at the clerk's office door until she saw Collins come outside, though she had not aroused her daughter until then.

The daughter testified that she was resting on the back seat of the automobile at the time. She says that it was not until the man was coming or had come down

the court house steps and neared the automobile that her step-mother called to her "look there." She also identified the man as Robert Collins. She had not seen him coming out of the clerk's office into the hall.

The ladies drove their car around the court house and down the street where they saw Junior Day, night policeman and reported to him. He too had seen a man walking up the street "kinda fast, with his hat pulled down a bit and his coat fastened." The witness added, "It was a little chilly." He would not say that this man was Robert Collins. The policeman verified the testimony of Mrs. Frazier and her daughter as to their inquiry of him and subsequent activity. She had told him then that she had seen Robert Collins. The policeman had found the outside door not fully closed by about "a quarter of an inch," but the clerk's office door was locked. Thirty or forty minutes after he had seen the man on the street, he saw Robert Collins in an automobile coming around the court house. The ladies re-established their guard. At some period (whether before or after the officer had seen Collins is not clear) the horn of the car was blown and the policeman went back to them. Mrs. Frazier "said she thought she seen somebody trying to get out of the window in the basement and we searched again." He found that a padlock on the basement door was not fastened. The upper part of the building could be entered through the basement door. But the doors to the clerk's office and all others in the building were locked, as he examined them. Neither Mrs. Frazier nor her daughter mentioned any of th's in their testimony.

Early the next morning, pursuant to a telephone call from Frazier's daughter, the county clerk, Astor Collins, met Frazier at the office, and they went in together. He unlocked the vault, and they examined it. According to Frazier, all the blinds were pulled down except the corner window in the hall next to the jail. The ballot boxes were stacked in the vault but the sacks (apparently containing the election paraphernalia) were "all out on the floor." The clerk testified that everything was in the same condition as he had left it Saturday afternoon. Frazier does not undertake to suggest any evidence of tampering except his reference to the location of the sacks. The clerk and his two deputies

testified that these had been on the floor at all times until Monday morning when they were put on top of the boxes in order to give more room in the vault.

Robert Collins, who is a member of the legislature and was Democratic campaign chairman during the recent election, testified that he did pass through Whitesburg along about eleven o'clock that Sunday night on his way to his mine about three miles beyond, and that he had driven around the court house to see if Redwine Hollan might happen to be in his office. He and Hollan were interested in mining and he had had men working the pumps that Sunday. He returned through the town in twenty-five or thirty minutes on his way back home. He had not stopped and, of course, had not entered the court house.

Harry M. Caudill had placed an automobile where Mrs. Frazier was parked in order to make a test. He was positive that a person in a car at that place could not possibly have seen a man come out of the clerk's office. Because of the roof of the car, it was not possible for one to raise his head high enough to see the inside door through the glass in the outside door. It had a high panel and was at the top of a series of steps.

This was all the testimony concerning the matter. However, the circuit judge relates in his opinion that he had made a test after dark with all lights in the court house turned off except those in the hall. In the test, he had had the jailer come out of the clerk's office, and he could be seen from the place Mrs. Frazier described when he had emerged about one foot from the office door.

After this occurrence, each party placed a guard in the court house every night. The case is reduced then to the question of whether the evidence concerning the happening on Sunday night is sufficient proof that the integrity had not been maintained, notwithstanding the proof that it had.

Mrs. Frazier alone and only testified that she had seen Robert Collins come out of the clerk's office. He denied it. All the other proof is that that door had been locked securely and that the vault was kept locked with a combination known only to the present county court clerk and his two women deputies. There is no evidence

tending to show that the arrangement of the boxes in the vault had been in any way disturbed.

It might have been, as suggested in the appellant's brief, that some man had gone into the court house to the public toilet and did come out as described by Mrs. Frazier. But we do not think that the evidence was sufficient to overcome the greater body of the evidence that the integrity of the boxes had been preserved. It might be possible that upon an examination of the contents something may be disclosed to show otherwise. That is yet to be determined.

This was the conclusion in Land v. Land, 244 Ky. 126, 50 S. W. 2d 518, where the evidence casting suspicion on the preservation of the boxes was stronger than that presented in the instant case. See also Austin v. Anderson, 279 Ky. 742, 132 S. W. 2d 56; Combs v. McKenzie, 289 Ky. 360, 158 S. W. 2d 938.

The judgment is reversed for consistent proceedings.