## Schoonmaker v. Dunlap.

(Decided June 4, 1918.)

### Appeal from Fayette Circuit Court.

1. Elections — Contest — Pleading. — In an election contest where fraudulent and illegal votes are cast and which the contestant desires to purge, it is necessary for the plaintiff to state in his pleading the names of the persons who cast such illegal votes, and upon the trial the investigation of no votes except those which he might name can be made. When plaintiff fails to point out the names of such voters and there is a motion made for the pleading to be made more specific it should be sustained by the court.

2. Elections—Contest—Pleading.—Where the record in an election contest shows that there has been such fraud, intimidation, bribery or violence in the conduct of the election that the court can not determine with any degree of accuracy the number of legal votes either party received or the number of legal votes that were cast, it is the duty of the court to declare in its judgment that no legal election was held if such conditions existed throughout the entire territory covered by the election, but if they existed in only one precinct the court may disregard that precinct and adjudge the election to the one receiving the highest number of votes cast in all the other precincts in which the election was held.

JAMES G. DENNY, R. G. COLBERT and MILLER & MILLER for appellant.

MAURY KEMPER, GEORGE C. MORGAN, JOE S. BOTTS and GEORGE W. VAUGHN for appellee,

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This suit is a contest over the election for the office of commissioner for the city of Lexington, brought by plaintiff, the appellee, against the defendant, the appellant. The litigants were rival candidates for the office at the regular November, 1917, election, and according to the returns as certified by the election officers for the 39 precincts in the city the plaintiff received 3,123 votes and the defendant 3,218 votes, giving to the latter, on the face of the returns, a majority of 95 votes.

Within the required time after the canvassing of the returns this contest was filed in which it is charged that in the 38 precincts within the city, not including Deweese street No. 2 precinct, plaintiff received a majority of 37 of all of the votes cast, and that in the Deweese precinct referred to the election officers who held the election conspired among themselves and with others unknown to plaintiff to elect the defendant and to defeat the plaintiff, and that such conspiracy was formed before the registration day, in October, 1917, and in pursuance thereof "by illegal methods and practices and flagrant violations of the laws of this Commonwealth" the said election officers permitted to register on the registration day and to vote at the regular election a great number of persons whose names were purely fictitious and others who did not reside in the precinct and others who were not present on the day of the election, some of whom were in the asylum and others in the penitentiary; that they permitted numbers of voters to vote open ballots contrary to the provisions of the statute permitting votes to be cast in that manner; that numerous ballots were fraudulently tampered with and showed that they had been marked by others than the voter; that persons friendly to the defendant and opposed to the plaintiff were permitted to be present at the voting precinct while the election was going on and who had no connection therewith; that the officers of the election on that day, as well as on the day of registration, had whiskey in the booth and became intoxicated and engaged in other fraudulent practices, all of which evidenced "such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected." It was further alleged in substance that

the plaintiff received at said precinct 35 legal votes and that the defendant did not receive a sufficient number of legal votes in that precinct to overcome plaintiff's majority at the other 38 precincts, plus the 35 votes which he obtained at the Deweese precinct.

A demurrer to the petition was overruled, followed by a motion to make it more specific, which was also overruled, after which an answer consisting of a denial only was filed, and upon trial the court sustained the allegations of the petition and adjudged that the plaintiff was duly elected to the office, and to reverse that judgment the defendant prosecutes this appeal.

It will be noticed that only one precinct is involved in this case, and the testimony, although voluminous, has been directed exclusively to what transpired there on the day of the registration and the day of the election. It is admitted that the majority which plaintiff received at the 38 precincts was valid and legal, and the same is admitted with reference to the 35 votes which he received at the Deweese precinct. So that the only question upon the merits of the case is to what extent are the allegations of the petition sustained with reference to the votes which defendant received in the contested precinct and whether there was shown to have been such fraud in the conduct of the registration and the election there as to authorize the court under the provisions of sub-section 12 of section 1596a of the Kentucky Statutes to throw out the entire vote cast at the contested precinct.

An insistence stoutly urged before us for a reversal is that the court erred in overruling the motion to make the petition more specific, and in support of this contention we are referred to the cases of Edwards v. Logan, 24 Ky. Law Rep. 678; Weller v. Mueninghoff, 155 Ky. 77; Butler v. Roberson, 158 Ky. 101, and cases referred to in those opinions.

Since rendering the opinion in the case of Butler v. Roberson, the last case cited by counsel, this court again upheld the rule for which he contends in the two cases of Francis v. Sturgill, 163 Ky. 650, and Thompson v. Stone, 164 Ky. 18. In each of the cases relied upon it is substantially held that in an election contest upon the ground that there were illegal and fraudulent votes cast for the contestee sufficient to reduce his total vote below that of the contestant it is necessary that the pe-

tition of the latter allege the names of the persons so illegally or fraudulently voting, and when it fails to do so and there is a motion for it to be made more specific it should be sustained, and that in such case the contestant can neither rely upon nor investigate any votes other than those which he might name in his pleading. The purpose of this is that the pleading should be made so specific and direct as to give the other party information of the ground on which the contest is based so that he may be prepared to make defense. The petition in this case enumerated the names of 86 voters in the Deweese precinct as having illegally for one cause or another cast their votes in the election complained of. The names of those who are fictitious and who did not reside in the district and who were illegally registered, and who were absent on the day of the election were set out, but there was a statement made that there were other illegal votes cast by persons whose names were unknown to the plaintiff, as well as the number of such unknown votes, and if the determination of the case depended upon the illegal votes cast by those who are unnamed in the petition, it is manifest that the judgment would have to be reversed because of the error in failing to sustain the motion to require the plaintiff to make his petition more specific by giving the names of the persons who cast the alleged illegal votes. But in this case the judgment is not rested upon the fact that plaintiff received a majority of the legal votes cast, including any polled at the Deweese precinct, for the court concluded under the testimony that the election attempted to be held in that precinct was so fraudulent that it was impossible to determine the number of legal votes cast therein, or for whom they were cast, and that it was authorized, under sub-section 12 of section 1596a of the Kentucky Statutes, to throw out and disregard that precinct altogether, and to adjudge the election to the candidate receiving the highest number of legal votes cast in the other precincts of the city, and it was upon this theory that the case was chiefly practiced and tried and upon which it was decided in the lower court.

As stated, a large volume of testimony was taken and read upon the trial, all of which has received our close investigation, but it would make this opinion too long to undertake to set it out in detail. It is sufficient to say that defendant's counsel concedes that at least as

many as 63 illegal votes were cast at the precinct in contest on the day of the election, and that a large number of names were wrongfully and illegally placed upon the registration book, and further, that every illegal vote cast in that precinct was voted for the defendant. They impliedly concede that all of the votes which defendant received at that precinct except 77 were illegal, because they attempted to establish by those 77 voters that they each voted for the defendant. The purpose in that was that it took 77 votes for the defendant to overcome the majority which he had over the plaintiff, including the 35 he received in the contested precinct. The court sustained exceptions to that proof, and of that ruling no complaint is made on this appeal, for the all-sufficient reason that the exceptions were sustained upon the ground that to permit a legal voter to thus testify would violate the law in regard to the secrecy of the ballot system. The trial court rendered an opinion in the case which is clear and convincing and evinces a thorough knowledge of the record. After stating the grounds of contest and the points presented by the testimony, the court, in arriving at his conclusions of fact as established by the testimony, said:

"Some features of the testimony may be considered. It is clear that whiskey was drunk by some of the officers, to such an extent that one, at least, was incapacitated. Six empty half-pint bottles were found in the booth at the close of the polls. It may fairly be concluded that the polls were opened before six o'clock. Vanaman, one of the officers, did not arrive until nearly six-thirty, at which time 14 ballots had already been cast. The substance of Vanaman's testimony is that he saw Delph signing his name on the back of the ballots as clerk, when Delph was judge and Martin clerk; that he picked up a ballot to see how far ahead Delph had signed them, and that the ballot slipped as he did so, exposing a stub that had been filled out ahead of the unvoted ballots; that he asked what this meant and was told it had been done by mistake; that he noticed dark lines along the edge of the ballot book as though ballots were out, and the end of the book opposite the end where the book was bound seemed much thinner than the end where the stubs were; that these dark lines ran through the top half of the ballot book; that he saw Emmitt

Martin take supplementary ballot stubs from his pockets and put them in numerical order on the stub file; that in doing this he seemed to use both side pockets of his coat, getting the stub of the large ballot (evidently the county ballot) from one pocket, and the small ballot (the city ballot) from another pocket; that he saw nothing in his hand when he put it in his pocket, but saw the stubs in his hand when he withdrew his hand from his pocket; that he saw that he arranged them on the stub in numerical order, and about two-thirty in the afternoon heard Martin ask Delph if they (the stubs, evidently) were all in; to which Martin made answer that they were, and that this conversation occurred just outside of the booth.

"He further says that on the way to the clerk's office, after the polls had closed, when they were making return of the vote, Delph told the witness, Vanaman, in response to a question from him, Vanaman, that they had put 73 ballots in the box. This is the substance of the testimony of this witness bearing upon the conduct of the officers.

"It appears from the testimony, and from the ballots themselves, which are in evidence, that 109 were signed by Delph as clerk, when he was judge, and 63 by Martin, and that 12 were not signed at all, which accounts for the 184 ballots returned. Among these ballots there are 16 that were not folded, and must, therefore, have been voted as open ballots; all of these were voted for the contestee and none for the contestant. Of the 12 ballots that were not endorsed 4 were cast for the contestant, and 11 for the contestee. It further appears from the testimony, and from the ballots themselves, that two different colored inks were used in stamping the ballots. A careful examination of the ballots thus stamped would lead to the conclusion that the county clerk had inadvertently placed a purple colored pad in the booth. This of itself would in no way influence the vote where the entire ballot is marked in the same color, but an examination of the ballots revealed the rather startling fact that some of the ballots are marked in different colored ink. As for instance: The ballot marked 151 is voted for Bradley, Land, McCorkle and Schoonmaker with a stencil mark that bears a different colored ink from the one placed after the name of Bradley. In the one instance the stencil is a

different shape, a different size, and makes a much heavier mark from the one that appears after the name of Riley, while the difference in the color of the ink is unmistakable. Ballot 82 is even more suggestive. It is voted for Johnson, McCorkle and Darnsby with one pad, and one colored ink, while it is at the same time voted for Riley, Schoonmaker and Land in a different shaped stencil and a different colored ink. Johnson and Riley being candidates for police judge and the voter being entitled to vote for but one, the fact that each is voted for in different colored ink pads and different shaped stencils leads to the inevitable conclusion that more than one person participated in the marking of that ballot. Ballot 158 is voted for George Land in one colored ink, and for Riley, Bradley and Schoonmaker, in a different color. Ballot 76 is voted for Riley, Schoonmaker, Freckman and McCorkle in one color and for Land in another. Ballot 65 is voted for Riley, Schoonmaker and Land in one color and for Bradley in another. Ballot 149 is voted for Riley, Bradley, Darnaby in one color and for Schoonmaker and Land in another. Ballot 180 is voted for Schoonmaker, Bradley, Freckman and Land in one color and for Riley in another. Ballot 113 is voted for Riley, Bradley, Dunlap and McCorkle in one color and Land in another. Ballot 115 is voted for Schoonmaker, Dunlap and McCorkle in one color and for Riley and Land in another. Ballot 117 is voted for McCorkle, Bradley, Darnaby and Freckman in one color and for Riley in another. It will be observed that there are ten of these ballots. There are several ballots that are marked entirely in purple ink, but in practically every instance it will be noted that the purple stencil is wholly unlike the other stencils, in shape, size and character of impression.

"It is further claimed by the contestant that 78 fictitious names were placed upon the registration books by Delph at the registration, and that these were voted at the election, and that 25 or more persons were permitted to vote who, for one reason or another, had no right to vote in that precinct."

Further along the court enumerates the names of 59 voters which were illegally added to the registration book of that precinct, and some twenty odd ballots were voted with the names of the candidate for commissioner marked with one character of stencil and kind of ink

and the names of candidates for other offices were voted for with different characters of stencil and ink, showing that at least a suspicion existed that the conspiracy charged did exist, and that the ballots so voted had been stamped for the office of commissioner by someone other than the voter. Numerous other facts are testified to and found by the court to show indisputably that the election attempted to be held in the Deweese precinct was a mere farce, and that it was nothing but a fraudulent and illegal performance instituted and conducted by the election officers and others for the purpose of carrying out wholly fraudulent, vicious and corrupt practices.

If sub-section 12 of section 1596a of the statutes, as applied in the cases of Scholl v. Bell, 125 Ky. 750; Harrison v. Stroud, 129 Ky. 193; Banks v. Sergent, 104 Ky. 843; Orr v. Kevil, 124 Ky. 720; Ford v. Hopkins, 141 Ky. 181; Butler v. Roberson, 158 Ky. 101, and Johnson v. Little, 176 Ky. 505, is to be given any effect at all there can be no doubt but that this case is one demanding its application, for in addition to the registration of illegal names and the casting of 86 such votes, other fraudulent and corrupt acts are clearly shown to have occurred on the day of the election. Ballots were taken out of the book ahead of their serial number. Different characters of stencils and ink were used by the voter on the same ballots. Strangers having no connection with the conduct of the election were openly permitted to go into the polls. At least twelve ballots were voted without being endorsed by anybody as clerk of the election, and the duties of that office, when exercised at all, were performed by any one who saw proper to do so. Many of the cases, *supra,* especially that of Banks v. Sergent, permit the votes of a precinct to be thrown out and the election awarded to the one receiving a legal majority of the votes cast in all the other precincts, and we are clearly of the opinion that the court was amply justified in taking that course in this case and in awarding the election to the plaintiff.

We feel it due to the appellant to say, as was done by the trial court in his opinion, that the record is entirely void of any evidence casting any suspicion upon him. This fact, however, although one to his everlasting credit, will not authorize us to award to him the certificate of election, since the votes cast in that precinct

were so tainted with fraud as to require their elimination, and without them the defendant has no sort of claim to the office.

Wherefore, the judgment is affirmed.