## Gross v. Ball.

(Decided March 12, 1935.)

MARTIN T. KELLY, LESLIE W. MORRIS and MARION T. RIDER for appellant.

E. H. JOHNSON, J. C. BAKER and RICHARD PRIEST DIETZMAN for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming in part and reversing in part.

Clinton C. Ball, as the Democratic nominee, and John B. Gross, as the Republican nominee, were rival candidates for the office of jailer of Harlan county in the general election held in November, 1933, and W. L. Bailey and Sarah Marlor were independent candidates for that office. On the face of the returns, as certified by the county election commissioners, Ball received 8,212 votes, Gross 8,003, Bailey 692, and Marlor 94, showing a plurality of 209 for Ball, who was accordingly awarded a certificate of election.

Gross instituted this contest proceeding, and in his petition covering over 100 pages set forth at length his grounds of contest. Ball, by his answer, counterclaim, and countercontest, entered a general denial to the material allegations of the petition, and affirmatively pleaded at length countergrounds of contest.

After the issues were completed and the evidence of scores of witnesses heard, it was adjudged that contestant's petition be dismissed and that contestee recover his costs incident to the contest. It was further ad-

judged that contestee's counntercontest be dismissed and that he pay the costs incident thereto, and contestant is prosecuting this appeal, and, upon motion of contestee, he has been granted, and is prosecuting, a cross-appeal.

The record consisting of the pleadings and evidence is made up of several volumes, with a total of nearly 3,000 pages, and it therefore necessarily follows that it would be impractical to enter into a detailed discussion of the pleadings and proof. After the formal allegations concerning his qualifications for the office, his compliance with the provisions of the law respecting the filing of pre-election and postelection expense accounts, appellant in the first paragraph of his petition centered his attack upon the election held in the following precincts, Tway No. 37, Verda Nos. 7, 7B, and 7C, Kildav No. 78, and Yancey No. 53. Appellant apparently has abandoned his attack on the legality of the election held in Yancey precinct, since we find nothing in the briefs concerning the alleged irregularities there, and we shall therefore confine our discusson to the pleadings and proof concerning irregularities in the other precincts called in question.

In the second paragraph of his petition appellant alleged in substance that appellee has violated the Corrupt Practice Act (Ky. Stat. sec. 1565b-1 et seq.) and had himself, and by and through others, with his knowledge, consent, and procurement, spent sums in excess of $5,000, and used money, whisky, and other things of value directly and indirectly to buy and bribe voters.

In his counterground of contest, appellee alleged in substance and effect that appellant violated the Corrupt Practice Act, and that he and others for him, with his knowledge, consent, and procurement, used money, whisky, and other things of value to bribe and corrupt voters, that the Republican candidates made up a fund of over $6,000 as a "jack pot" to be used in corrupting and controlling the election, and that appellant contributed to this fund, and it was used for the purposes indicated with his knowledge and consent. He also set out at length illegal votes cast for appellant in 12 to 15 of the various precincts in the county.

Concerning the Tway precinct, it is alleged in apellant's petition that the county election commissioner

certified 626 votes cast for appellee and 63 for appellant; that not more than 200 persons voted in that precinct and that more than 450 votes counted as cast for appellee were not in fact voted by any legal voter having a right to vote therein, but that the election officers wrote, or permitted others to write, on the stub books names of persons who did not vote and permitted the ballots to be taken out of the ballot book, marked as voted for appellee, and deposited in the ballot box; that many of the voters in the precinct are employed by the Tway Coal Company, and nearly all of them live in houses in a mining camp owned by the company; that the officials, foreman, and persons in authority in the coal company were hostile to appellant, and compelled and intimidated voters to attend the election to vote against him and for appellee; that a large number of persons, not legal voters in the precinct, were permitted to and did vote therein under names furnished by election officers or by persons assisting them, and that many of the names placed on the stub books were taken from the payroll sheets or other books of the coal company and were names of persons not then employed but who had theretofore been employed by the company. The petition sets forth the names appearing on the stubs of the ballots used in the precinct indicating those alleged to be entitled to vote and those alleged not entitled to vote by the word "legal" or "illegal" following each name; allegations in substance the same were made concerning each of the precincts referred to in the petition.

In addition to these general allegations, it was alleged that in Kildav precinct the election officers, with the assistance of one W. F. Middleton, wrote, marked, and put in the ballot boxes more than 300 illegal votes; that in Verda No. 7C ballots were illegally written and stamped in alphabetical order, that is, it appears from the stub books that voters whose names began with the letter A voted ballots 153-166, inclusive, except ballot 166; that voters whose names began with the letter B voted ballots 167 to 178, inclusive, except ballot 172, and so on with the other letters of the alphabet; that Republican challengers in these precincts were through threats, force, and intimidation, prevented from serving. The petition sets out the number of votes counted for appellee in each of the precincts designated, and

also alleged that he received a certain number of legal votes in each of the precincts which in each instance was much less than the votes counted for him; the total of the alleged illegal votes being greater by far than the plurality received by appellee. It was alleged in substance that the votes cast for appellee in each of the precincts attacked by the petition should be corrected in the general return and total counted, and be wholly disregarded as to the votes for appellee, and that only the legal votes cast in such precincts be counted. The prayer of the petition with respect to the illegal votes in these precincts is that the illegal votes cast and counted for appellee be deducted from the count for him in such precinct. It will thus be seen that appellant did not ask that these precincts be thrown out and disregarded as a whole, but specifically prayed that the returns from these precincts be purged of the alleged illegal votes cast for appellee. Counsel for appellant are now asking that the entire vote in the three Verda precincts and in Tway and Kilday be thrown out and wholly disregarded. They are asking this relief under the familiar "20 per cent" rule which has long been applied in this state in election contest cases.

On the other hand, counsel for appellee are insisting that appellant is only entitled to the relief sought and prayed for in his petition, and that he has not alleged specific facts to warrant the throwing out of the five precincts called in question, nor has he prayed for such relief, and therefore he is only entitled to have the vote counted and certified for appellee purged of such votes as have been shown to be illegal.

The right to contest elections is purely statutory. Colvin v. Mills, 214 Ky. 812, 284 S. W. 115; Craft v. Davidson, 189 Ky. 378, 224 S. W. 1082; Dodge v. Johnson, 210 Ky. 843, 276 S. W. 984. Contest proceedings in elections of this character are provided for, and controlled by, section 1596a-12, Kentucky Statutes, as amended by Acts 1930, c. 51, which provides that in such cases "the contest shall be made by the filing of a petition in the circuit court of the county where the contestee resides. * * * Such petition shall be filed and process issued within thirty days after the day of election; and shall state the grounds of the contest relied on, and no other ground shall afterward be relied upon."

It was the purpose and intent of the Legislature, as manifested by the statute, that election contests should be promptly initiated and speedily heard and determined, and to this end it was necessary, and the lawmakers recognized the necessity, that the issues should be definitely made within the time provided, and that no grounds other than those relied on in the pleadings should afterward be asserted.

Unquestionably upon proper proof it may be declared that there was no election or the vote in certain precincts may be thrown out. One of the most recent cases dealing with that question is Scott v. Roberts, 255 Ky. 34, 72 S. W. (2d) 728, 730, but in that case the contestant asked (1) that he be adjudged entitled to the office and (2) that, if this could not be done, it be declared there was no election because the corruption and irregularities were such as to render it impossible to determine who had received a majority of the legal votes. The petition among other things charged that:

"There was such a large amount of bribery, corruption, coercion, illegal voting and conduct in the holding of said election, which number of illegal votes was greater than 20% of the votes cast in said race that it is impossible to determine who was legally elected, and that said election should be declared null and void. * * *"

In Humbert v. Heyburn et al., 240 Ky. 405, 42 S. W. (2d) 538, 542, it is held in effect that a prayer for any relief afforded by the Corrupt Practice Act will be ineffectual without both pleading and proof to authorize it. The opinion applies to election contest cases the general rule that "a fact necessary to be proven must be alleged in the pleading, and proof without pleading or pleading without proof will not sustain a cause of action."

Appellant, Gross, charges that appellee received illegal votes which, if deducted from his total would show a majority for contestant, and he asked that he be declared elected, but he does not pray for the additional relief asked in the Roberts Case. With respect to the quoted provisions of the statute, it has been held that a ground of contest improperly or defectively stated in the petition may be cured by an amended petition filed after the time provided by the statute in which to

file an original petition, but, even in that event, no new or additional grounds of contest may be pleaded in such amendment. Felts v. Edwards, 181 Ky. 287, 204 S. W. 145. To the same effect see Salyer v. Gross, 253 Ky. 296, 69 S. W. (2d) 376. In the case of Kean v. Whittle, 210 Ky. 273, 275 S. W. 818, it is said:

"The only ground of contest set up by Kean being the failure of the election officers to certify properly the vote in precinct No. 10, he could not in his reply to Whittle's response set up other grounds. It is urged that Whittle is estopped to complain that certain persons voted for Kean on the table when others in the same precinct voted for him in just the same way.. But to apply such a rule would be to disregard the statute, which was plainly aimed to require all grounds of contest to be set up in the notice of the contestant."

While section 1596a-12, supra, further provides:

"In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the court of appeals finally may adjudge that there has been no election,"

yet the allegations and proof necessary to warrant the application of that provision are essentially different from the allegations and proof necessary to purge the poll of illegal votes cast for a candidate. In order to invoke the 20 per cent. rule now relied on by appellant, it must appear that that per cent. or more of the votes cast in a precinct were illegal and that it was impossible to determine for whom they were counted. In order to purge the polls of illegal votes, it is necessary to allege and prove that illegal votes were cast and counted for a particular candidate. Under the allegations and prayer of the petition, the burden was upon contestant to show that illegal votes were cast for appellee, and that he (appellant) received a majority of the legal votes, Drennan v. Roberts, 234 Ky. 574, 28 S. W. (2d) 735; and that was the issue that contestee was required to meet. It was not enough to show that illegal votes were cast in order to purge the poll, but it was incum-

bent upon contestant to show that they were cast for appellee. If it had been alleged and proven that more than 20 per cent. of the votes cast were illegal and it could not be determined for whom they were voted, then appellant might have been granted the relief he now seeks, but, if he had alleged such facts and asked for that relief in his petition, a different issue would have been made, and appellee, in such a state of case, might have been able to show for whom the alleged illegal votes were cast.

We are constrained to hold that appellant is confined to the facts stated in his petition and the relief sought thereby, and therefore the task then confronting us is to determine whether under the evidence it has been established that enough illegal votes were cast or counted for appellee to change the result of the election if they be purged. The evidence for appellant tends to show that in the five precincts persons who were not residents or legal voters therein were permitted to vote. Others were permitted to vote in the names of legal voters. Officers of the election and others wrote names of persons who were not present upon the stubs, and stamped and deposited the ballots in the boxes. In fact, the evidence for appellant strongly conduces to show that the election was conducted without regard for law, order, or decency; but by equally numerous credible witnesses for appellee there is evidence having an equal tendency to show that these alleged irregular acts and illegal voting did not in fact occur. In view of this conflict in evidence of witnesses, the most convincing evidence that fraud was actually practiced is the alphabetical order in which the names of voters appear on the stubs in Verda precinct No. 7C, but it is not shown for whom these votes were cast or counted, and, so far as the record discloses, appellant himself may have profited by any irregularities in this particular. In this state of case, neither the circuit or appellate court is authorized to deduct these ballots from the votes cast for appellee.

Witnesses for appellant testified that in the Kildav precinct one Middleton took one of the ballot books out of the polling place and wrote about 300 names on the stubs, and he and others stamped these ballots and placed them in the ballot box. It is further testified that there was an arrangement whereby 3 of these

ballots would be stamped for appellee and one for the independent candidate, Bailey. If there were 300 of such ballots and they were voted under such an arrangement, appellee would have received 225 and Bailey 75, but Bailey received 205. He received only 14 in all the other precincts called in question and an average of something over 10 votes in each of the precincts in the county. The evidence of some of the witnesses indicates that the arrangement was for Bailey to receive one out of every three of the ballots so marked. Under this arrangement appellee would have received approximately 200 and Bailey 100. It is apparent from the vote as certified by the election commissioner that, if there was such illegal marking of ballots, Bailey profited to a far greater extent than indicated by the evidence of the witnesses; however, election officers and others present testified positively that no such thing occurred. Regarding this evidence in the light most favorable to appellant, appellee received by this alleged illegal method of marking ballots 15 or 20 more votes than his plurality over Gross, and, when turning to the evidence in support of appellee's countercontest, we find undisputed and convincing evidence of such numbers of bribed and illegal votes cast for appellant which, if purged as they should be, would still show appellee elected by a greater plurality than that certified by the election commissioner.

The evidence introduced to sustain the charge that appellee violated the Corrupt Practice Act, and by himself and by and through others, with his knowledge, consent, and procurement, expended money and used whisky to bribe and corrupt voters, is very meager indeed. There is evidence that he took an envelope containing about $75 to a merchant in the county a few days prior to the election, but he testified that he was not on good terms with this merchant and that he carried this package to him at the request of, and for the accommodation of, another candidate and did not know its contents. In this he is corroborated by other witnesses. There is some evidence that he made statements prior to the election that he expected to expend certain sums. He admitted making one of these statements, but testified that it was merely talk between the candidates and that he did not in fact expend such sums. He admitted that he contributed to a fund of about $500 to $600 made up by candidates on his ticket to be used in de-

fraying expenses, and that he drew out of this fund something over $200 which he expended for legitimate purposes, some of which was for the hire of automobiles to be used in transporting voters to the polls. Some witnesses testified that he gave them money to pay for the use of their automobiles, and this he admitted and testified that it was included in that item of expense on his post election expense account. It is shown that friends and relatives of appellee were active and were using money in the election, but there is no evidence whatever to bring knowledge of these things to appellee. On the record as a whole, the conclusion is inescapable that the court did not err in dismissing appellant's petition.

Turning to the evidence to sustain the charge that appellant received illegal votes and that he violated the Corrupt Practice Act, the evidence is convincing and conclusive. It is shown that some of the candidates on the ticket with Gross make up a fund of $3,000 or more, and that much of this was used to buy and bribe voters for the entire ticket, including appellant. One witness testified that he paid at least 70 voters to vote the Republican ticket, including appellant. Others testified as to various numbers of voters being paid to vote this ticket. This evidence discloses beyond question that there was a wholesale use of both money and whisky for the purposes indicated; over 30 gallons of whisky being used in some of the precincts. Undisputed evidence shows that appellant was present in the home of one of the candidates on his ticket on the night before the election where money was being distributed and sent to various precincts. A large number of persons were introduced as witnesses who testified that they were paid to vote the entire Republican ticket. A number of witnessess testified that they approached appellant or he approached them and directed them to election workers who were using money. There is evidence that one man came from Bell county and stated that he had money to be used for appellant, and some witnesses testified that appellant had asked them if they had seen this man or had directed them to him. Others testified that parties were distributing whisky to be used for appellant, and one or two witnesses stated that they saw him in the automobile from which liquor was being distributed. Appellant denied practically all,

if not all, of these charges. But without going into further detail it may be said that the evidence for appellee fully sustains the allegations of the counter-contest concerning illegal votes cast and counted for appellant and the violation of the Corrupt Practice Act by him. It is therefore apparent that the lower court erred in dismissing appellee's counterclaim and counter-contest and adjudging that he pay the costs incident thereto.

Wherefore the judgment is affirmed on appeal and reversed on cross-appeal, with directions to enter judgment in conformity with this opinion.

Whole court sitting.