Virgil NAPIER, Appellant,

v.

Babe C. NOPLIS, Appellee.

Court of Appeals of Kentucky.

Dec. 12, 1958.

D. G. Boleyn, Hazard, for appellant.

W. M. Melton, Hazard, for appellee.

MILLIKEN, Judge.

The controlling issue in this election contest is the meaning and applicability of the so-called "20% rule" usually attributed to our 1908 opinion by Judge O'Rear in Harrison v. Stroud, 129 Ky. 193, 110 S.W. 828. For collection of cases, see Ky. Digest, Elections, The "rule" has been used to determine when an entire election or the vote in a precinct should be nullified by the court.

After a recount of the votes cast in the November 1957 election for magistrate in Perry County, Noplis, the contestee and appellee in the present action, was declared the winner by a 30 vote margin. The contestant, Napier, besides alleging violations of the Corrupt Practices Act, including bribery and chain balloting, asserted that certain named voters, amounting to more than 20% of the total vote cast in each of two precincts, were nonresidents of the respective precincts, hence had voted illegally and, consequently, the votes of the two precincts should be disregarded with the ultimate result that he, the contestant, be declared the winner of the election.

The trial judge found that the charges concerning violations of the Corrupt Practices Act on the part of the contestee were not substantiated, and we agree with his conclusion without extending this opinion by discussion. CR 52.01. In addition, he declared in his opinion: "No attempt was made by plaintiff (contestant) to prove for whom the named illegal voters cast their ballots. This the plaintiff (contestant) is required to do or he must show that it is impossible to determine for whom illegal votes were cast. Since plaintiff (contestant) did neither by his proof he cannot rely upon the 20% rule to have the two precincts disregarded in the vote tabulation. The court cannot under the evidence submitted in this action disfranchise the legal voters in precincts 35 and 27. The plaintiff failed miserably in his burden of proving a case where the 20% rule could be applied. Land v. Land, 244 Ky. 126, 50 S.W.2d 518, and Gross v. Ball, 258 Ky. 730, 81 S.W.2d 409."

For reversal of the judgment the contestant asserts that it is not necessary either to name specific voters or to show for whom they voted when the entire election

in a precinct is challenged, citing Ragan v. Burnett, Ky.1957, 305 S.W.2d 759, in which we voided absentee ballots as a class without disclosure as to how individual absentee voters may have voted.

 Before attempting a discussion of the question presented, it may be well to point out that an election contest is a purely statutory proceeding unknown to the common law. 18 Am.Jur., Elections, Section 275. Generally, an election contest does not come within the general equity powers of the courts. 29 C.J.S. Elections § 248; 18 Am.Jur., Elections, Section 272; Harrison v. Stroud, 129 Ky. 193, 110 S. W. 828. Authorization for such proceedings in this state is found in Section 153 of the Constitution and the statutes enacted pursuant thereto, KRS Chapter 122. Although violations of the Corrupt Practices Act, KRS Chapter 123, are specifically referred to by KRS 122.010 as a ground of contest, apparently any violations of law affecting the election may be grounds for contest. However, according to our statute, KRS 122.080(4), the courts "may adjudge that there has been no election" only "if it appears from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence *in the conduct of the election* that neither contestant nor contestee can be adjudged to have been fairly elected * * *." KRS 122.080(4).

In Harrison v. Stroud, [129 Ky. 193, 110 S.W. 830] above, the aforequoted statute, then subsection 12, Section 1596(a), Ky. Stat.1903, was expressly invoked, and the election set aside where *"the officers of election* suffered about 20 per cent. (of the voters), far more than enough to have changed the result either way, to ignore constitutional and statutory requirements, and to that extent conduct the election in open violation of the law." In Harrison, about 20% of the voters were allowed to vote openly, instead of by secret ballot which caused the court to observe: "This election was one only in form * * *.

Immaterial derelictions, not influencing the result, may be and ought to be disregarded; but transgressions of the election law which practically disfranchise enough voters offering to vote, so that the result might have been different but for the illegal acts, would simply substitute an election by some for the election contemplated by law, which is by all. The law deems it better that such elections should not stand. When it becomes known that they will not, the main incentive to those who indulge such practices is removed." Only three votes separated the litigants in the Harrison case, and such a large percentage of the vote was so patently illegal that it could well be concluded that the "conduct of the election" so reeked with fraud that the election should be set aside. In Harrison, the court apparently concluded that it was impossible to ascertain which voters had voted publicly or what effect such voting had on other voters.

In the 1931 case of Land v. Land, 244 Ky. 126, 50 S.W.2d 518, 520, in which illegal votes were involved, the inferences which might be drawn from our opinion in Harrison, as to the scope of the so-called 20% rule, were limited when it was written that: "It is submitted that it is the established rule that the vote of an entire precinct will be thrown out when as much as 20 per cent. of the total vote was illegal. That rule is not so broad. It is only when it has been shown that such large proportions of the votes cast were illegal *and it is not possible to determine how they were voted,* and consequently to charge them to the recipient, that the entire electorate of the precinct will be disfranchised." And, two years later Judge Dietzman commented in Johnson v. Caddell, 251 Ky. 14, 64 S.W.2d 441, 443: "Although the rule (20%) was expressed very broadly in the earlier cases and especially in that of Harrison v. Stroud * * successive opinions of this court have developed the rule until it reached the form in which we now have it in the Land case."

In 1933, in Watts v. Bowen, 250 Ky. 678, 63 S.W.2d 917, 918, Judge Rees quoted the rule as stated in Land v. Land, above, and refused to apply it where the county clerk had supplied an excess number of ballots, in violation of the Statute, Sec. 1596c–6, now KRS 118.190, to two precincts in order to meet an unexpectedly large vote in a primary election, and it was charged the use of the excess ballots resulted in illegal votes being cast. The court held that it was possible to ascertain who cast the allegedly illegal votes from the stub books, to ascertain for whom they were cast, and to deduct them from those polled for the respective candidates. The opinion declared:

> "The number of illegal votes cast in Sinai precinct was not 20 per cent. of the total cast, and the rule adopted by this court that the entire vote of a precinct will be thrown out where it is shown that more than 20 per cent. of the votes were illegal, and it cannot be determined for whom they were cast does not apply, *but it is argued that, where it appears that illegal votes have been cast in an election sufficient in number to change the result, and it is impossible to ascertain the number of illegal votes cast for each candidate, the votes of the entire precinct where any illegal votes were cast should be disregarded. The rule contended for has never been applied except under the provisions of section 1596a–12, Kentucky Statutes,"* (now KRS 122.-080(4), heretofore partially quoted).

In Watts v. Bowen, above, it apparently was the understanding of the court that the 20% rule was the only criterion which covered contest cases not coming within the purview of KRS 122.080(4) governing cases involving "fraud, intimidation, bribery or violence in the conduct of the election" because the court remarked: "The section of the Statutes * * * does not govern in determining whether or not the entire votes of the two precincts should be disregarded, and we are relegated to the 20 per cent. rule adopted by this court. In Sinai precinct the number of alleged illegal votes does not amount to 20 per cent. of the total votes cast, and therefore, under the rule, that precinct cannot be thrown out."

A year later, in Scott v. Roberts, 1934, 255 Ky. 34, 72 S.W.2d 728, 731, the court, admitted, "That percentage (i. e. 20% became a criterion, but it is not a rigid or an arbitrary mathematical measurement." In 1935 the court resolved the difficulty commented upon by Judge Rees in Watts v. Bowen, above, by concluding that the statute (KRS 122.080(4)) covered all grounds of contest whether specifically mentioned therein or not, a conclusion based on the theory that "the object of the statute (is) to prevent illegal elections." Bowles v. Knight, 257 Ky. 640, 78 S.W. 2d 913. The 20% rule thus was evolved by the court as an aid in determining when to invoke the drastic statutory power of nullifying an election or vote in a precinct, an act which inevitably would disfranchise many legal voters. It had long been determined that a mathematical rule should not be applied where corruption so pervaded an election that it was impossible to separate the legal from the illegal. Taylor v. Neutzel, 1927, 220 Ky. 510, 295 S. W. 873. But in those cases where the course of justice was not obvious, where it was impossible to separate the legal votes from the illegal, and to charge the illegal votes to the proper recipient, the court faced the grave problem of balancing the interest of the legal voter in his franchise rights against the known fact that irregularities are present in most elections. Elections could not be set aside lightly; the courts could not assume the role of Czar, nullifying the will of the many in order to counteract the faults of the few. The so-called 20% rule was evolved as a standard of substantiality and, not a precise measure, a criterion for the court to consider in deciding whether to invoke the drastic statutory power of setting aside an election in part or in toto. Where the

course of justice was clear, no such rule was necessary. The gist of the so-called 20% rule then is that, where there are illegal votes cast in an election (as distinguished from fraud or impropriety in the conduct of an election), and it is impossible to determine for whom the votes were cast, the courts will not invalidate the election unless the amount of illegal votes is so substantial that the courts are warranted in concluding that there was not a fair election. Because of the sensitive position of the courts in election contests where the very heart of the democratic process is unsheathed, specific pleading and proof are required wherever possible and general charges not welcomed.

■ The standard of pleading and proof required is stated in Hogg v. Caudill, 254 Ky. 409, 71 S.W.2d 1020, 1021, (which overruled Banks v. Sergent, 104 Ky. 843, 48 S.W. 149, and Caudill v. Stidham, 246 Ky. 174, 54 S.W.2d 654), where it was claimed 20% of the votes had been cast after the polls should have been closed. We said: "Those (votes) cast after 4 o'clock being illegal, it was proper to compel the voters who voted after 4 o'clock to testify for whom they voted. * * * This being so, in order to entitle Hogg to have the votes cast for the recipient deducted from his total vote, it was indispensably necessary to set out in his pleadings the names of the voters who voted after 4 o'clock and for whom they were cast, and support the allegations, if need be, by the testimony of the voters who voted after 4 o'clock * * * that in a contest where the ground was the casting of ineligible votes the pleader must name in his pleadings the persons whose votes he questions and the grounds upon which he bases his objection as well as the facts which rendered them ineligible and sustain his allegations by competent evidence." To the same effect see Gross v. Ball, 1935, 258 Ky. 730, 81 S.W.2d 409. See Hodges v. Hodges, Ky.1958, 314 S.W.2d 208, for effect of new Civil Rules on Election Contests. For collection of cases involving the so-called "20% rule," see Ky. Digest, Elections, ■■.

In our recent opinion in Gregory v. Stubblefield, Ky.1958, 316 S.W.2d 689, 692, the principle spelled out in Hogg v. Caudill was reaffirmed, the court commenting: "It is to be noted that appellant's allegation is concerned only with a percentage of the votes cast. It has been held that when every vote cast in the precinct is claimed to be illegal, the names of the alleged illegal voters must still be pleaded. Brock v. Williams, 260 Ky. 569, 86 S.W.2d 324; Jackson v. Bolt, 292 Ky. 503, 166 S.W.2d 831. Under the rule in the Land, Johnson, and Gross cases, the trial court correctly held that the pleading was defective for failure to allege that it was impossible to tell for whom the twenty per cent or more of the illegal votes was cast."

■■ In the case at bar, the names of the alleged illegal nonresident voters were listed, but the contestant failed to prove, as he could have done, how they voted within the rule summarized in Hogg v. Caudill, above. We agree with the general statement made in Ragan v. Burnett, Ky. 1957, 305 S.W.2d 759, 761, to the effect that it is not always necessary to plead the names of voters where an election is contested upon the ground of violation of the Corrupt Practices Act, KRS 123.010, nor where, as in the Ragan case, "the attack is upon the absentee voting methods followed, not upon specific voters or specific votes." In the Ragan Case, the trial court had dismissed the contestant's complaint for failure to list the names of the voters casting the absentee ballots. Obviously, the names of individual voters are unimportant when an entire class of voters—absentee ballots in that case—was questioned or nullified because of the failure of county officials to comply with the law (KRS Chapter 126) safeguarding the integrity of absentee voting. See, also, Crowe v. Emmert, Ky. 1957, 305 S.W.2d 272, where all absentee ballots were nullified. Nonresident voters cannot be challenged as a class because

their nonresidence is an individual matter, and their individual effects upon the election are separable.

The judgment is affirmed.