Isaac **WATTS**, Appellant,

v.

George **FUGATE**, Appellee.

Court of Appeals of Kentucky.

June 6, 1969.

Arthur L. Brooks, Lexington, William P. Bach, Jackson, for appellant.

Shumate, Shumate & Flaherty, Irvine, Jackie Franks, Jackson, for appellee.

PALMORE, Judge.

The appellant, Isaac Watts, brought this action against the appellee, George Fugate, under KRS 122.070 to invalidate Fugate's election to the Breathitt County Board of Education and have himself declared the winner. The trial court sustained a motion to strike certain portions of the complaint, held that Watts could not amend the complaint, and sustained Fugate's motion to dismiss.

Watts and Fugate were the only candidates for election to the school board for Division 5 of the county at the regular election held on November 5, 1968. According to the contested tabulation a total of 898 votes were cast in this particular race, with Fugate winning by a 72-vote margin of 485 to 413. The contest centers on the Meeting House Branch precinct, which is a "split" precinct in that it embraces part of Division 5 and part of another school board division. In this precinct Fugate won by a vote of 98 to 3. A voting machine was used.

In paragraph 3 of the complaint it was alleged that only 72 of the voters whose names appeared on the comparative signature book compiled at Meeting House Branch precinct on the day of the election were residents of Division 5, so that 29 of the votes cast in the race between Watts and Fugate necessarily were illegal. These allegations were stricken for failure to identify the illegal voters or to state the impossibility of securing their names.

Paragraph 4 of the complaint alleged that 310 votes were counted in Meeting House Branch precinct, of which 127 were illegal. It listed the names of the persons alleged to have voted illegally and stated the various reasons they could not or were not entitled to vote in the precinct, but did not say for whom their votes were cast or counted. Paragraph 4 apparently was stricken for the latter reason.

Watts moved for permission to amend his complaint to state that he could not determine which of the 127 votes were cast or counted in his race, but the motion was overruled under the authority of Gregory v. Stubblefield, Ky., 316 S.W.2d 689 (1958).

Paragraphs 5, 6 and 7 of the complaint alleged fraud, coercion and intimidation practiced at the polling place in behalf and with the consent of Fugate and negated the existence of any such conduct by or in behalf of Watts. The record does not indicate the ground relied on by the trial court in striking these paragraphs, but the objection expressed in Fugate's motion was that they stated conclusions without supporting facts.

The controversy turns another page in the long and confusing history of the "20%

rule" which has been used in determining whether an entire election or the vote in a particular precinct should be nullified. See Napier v. Noplis, Ky., 318 S.W.2d 875 (1958). The genesis of this principle is ascribed to Harrison v. Stroud, 129 Ky. 193, 33 K.L.R. 653, 110 S.W. 828, 16 Ann. Cas. 1050 (1908), in which an election for the office of town marshal was invalidated on the ground that about 20% of the votes counted in the election, "far more than enough to have changed the result either way," (110 S.W. at p. 830), had been cast illegally. "While it is the general rule, and a good one, that irregularities, the result of which upon the election can be shown with reasonable certainty to have been not prejudicial, may be disregarded, and the result of legal votes cast in the manner authorized by law be allowed to stand, yet when such irregularities are so widespread or general as to leave the judicial mind in doubt as to how the election did go, or would have gone but for them, then they cannot be eliminated." Id.

"The gist of the so-called 20% rule then is that, where there are illegal votes cast in an election (as distinguished from fraud or impropriety in the conduct of an election), and it is impossible to determine for whom the votes were cast, the courts will not invalidate the election unless the amount of illegal votes is so substantial that the courts are warranted in concluding that there was not a fair election." Napier v. Noplis, supra, at 318 S.W.2d 879.

It will be noted that the foregoing quotation from Napier v. Noplis states the rule in the converse; that is, illegal votes constituting *less* than a substantial proportion (20%) of the total number cast will *not* authorize invalidation of the election, even though its outcome would depend on how the illegal votes were cast.

To illustrate, if 100 votes are cast, 51 for candidate A and 49 for candidate B, if B can prove that 20 or more were illegal and it cannot be determined for whom they were cast, the election will be invalidated. If B can prove that three illegal votes were cast in favor of A, and it is not shown that there were any offsetting votes cast illegally for B, B is entitled to be declared the winner; but if the number of illegal votes is less than 20 and B is unable to prove how they were cast he is not entitled to have the election nullified, and obviously cannot have himself declared the winner. If a contestant cannot prove for whom the illegal votes were cast, and they amount to less than 20% of the total, they are charged against him.[1] Gross v. Helton, Ky., 267 S.W.2d 67, 69, 70 (1954); Johnson v. Caddell, 251 Ky. 14, 64 S.W.2d 441, 444 (1933).

It may be seen, therefore, that the 20% rule represents a point at which the courts will admit an exception to the general principle that if the contestant cannot prove the illegal votes were cast for his opponent, he loses.

Apparently the first reported case in which a *precinct* vote was nullified on the basis of illegal voting was Banks v. Sergent, 104 Ky. 843, 20 K.L.R. 1024, 48 S.W 149 (1898), in which it was held, "in any case where it is shown votes have been received at any precinct after 4 P.M. sufficient to affect the result, that that precinct should be disregarded, as there is no way to identify the tickets, if not destroyed, nor any power or way to ascertain how these illegal votes were cast, and consequently it is impossible to disregard these votes only, by deducting them from the party for whom they were cast." 48 S.W. at p. 151. This case was overruled in Hogg v. Caudill, 254 Ky. 409, 71 S.W.2d 1020, 1022 (1934).

In Browning v. Lovett, 139 Ky. 480, '29 K.L.R. 692, 94 S.W. 661 (1906), the court

---

1. This rule, however, could only apply to the extent of the number of votes received by the contestant. Obviously, illegal votes in excess of the total number of votes received by the contestant in a precinct would have to be charged against the contestee.

disapproved the elimination of a precinct by reason of illegal ballots, reasoning as follows: "The effect of this ruling was not only to disfranchise all the voters of that precinct, but to deprive appellants of the substantial majority they received as shown by the returns. The reason assigned for failing to count the vote in this precinct was that some 20 or 30 persons were directed how to vote by the officer of election, upon the ground that they were illiterate, and unable to mark their ballot without assistance, although none of them was sworn before his ballot was thus marked. * * * The vote of this precinct was contested by contestees, who sought to have the entire precinct rejected because of the irregularity mentioned. The names of the persons who thus voted on the table and the candidates for whom they voted could have been ascertained by the contestees from the evidence of the officers of election who saw those persons vote and knew for whom they voted, or, if need be, by the evidence of the voters themselves, and the burden was on the contestees to show these facts. If they had done this, these votes could and would have been deducted from the total without invalidating the entire election in that precinct, but, failing to do this, they cannot have the entire precinct rejected for this irregularity."

The line of decisions flatly applying the principle of Harrison v. Stroud, supra, 129 Ky. 193, 33 K.L.R. 653, 110 S.W. 828, 16 Ann.Cas. 1050, at the precinct level seems to begin with Schoonmaker v. Dunlap, 180 Ky. 835, 203 S.W. 709 (1918), in which the court said: "Many of the cases, supra, especially that of Banks v. Sergent, permit the votes of a precinct to be thrown out and election awarded to the one receiving a legal majority of the votes cast in all the other precincts, and we are clearly of the opinion that the court was amply justified in taking that course in this case, and in awarding the election to the plaintiff."

Dictum to the same effect appears in Hall v. Martin, 183 Ky. 120, 208 S.W. 417, 419–420 (1919).

In Smith v. Jones, 221 Ky. 546, 299 S.W. 170 (1927), it was held that "where as much as 20 per cent. of the total vote has been illegally cast, and it is impossible to determine the result of the legal vote between the contending candidates, the precinct should be thrown out." The only authorities cited in support were Harrison v. Stroud, supra, 129 Ky. 193, 33 K.L.R. 653, 110 S.W. 828, 16 Ann.Cas. 1050; Manning v. Lewis, 200 Ky. 732, 255 S.W. 513 (1923); and Marilla v. Ratterman, 209 Ky. 409, 273 S.W. 69 (1925). In *Manning,* the only reference to the question was a scant comment that "our hurried investigation forces us to the conclusion that the court was in error in throwing out any of them, *except Annville precinct,* in Jackson County, which gave appellant 71 majority and would reduce his certified majority to 148 votes." (Emphasis added.) Again in *Marilla,* no distinction was drawn between the nullification of an entire election vis-a-vis the election in an individual precinct or precincts, and most of the precedents cited in support of the court's elimination of individual precincts were cases decided on the issue of whether an entire election should be thrown out. 273 S.W. at pp. 74, 75. *Harrison,* of course, involved the invalidation of an entire election.

It thus appears that the 20% rule was broadened and made applicable to individual precincts as a matter of course, without much real consideration of the basic difference between *invalidating* an election and throwing out a precinct to *change the result* of the election. Our study of the problem convinces us that the rule should never have been applied to individual precincts.

■ Election contests are purely statutory. Napier v. Noplis, Ky., 318 S.W.2d 875, 877 (1958). The statute under which

Harrison v. Stroud was decided (Sec. 1596a–12 Kentucky Statutes), now KRS 122.080(4), provides that if there has been such irregularity in the conduct of the election "that neither contestant nor contestee can be judged to have been fairly elected, the circuit court, or the Court of Appeals, on appeal, may adjudge that there has been *no election*." (Emphasis added.) KRS 122.040 makes the same provision with respect to primary elections. These are the statutes under which the 20% rule originated, developed, and has been applied. Watts v. Bowen, 250 Ky. 678, 63 S.W.2d 917, 918 (1933); Napier v. Noplis, supra. Upon the premise that the "irregularities are so widespread or general as to leave the judicial mind in doubt as to how the election did go, or would have gone but for them" (Harrison v. Stroud, at 110 S.W. 830), they authorize an adjudication of "no election." They do not, in such a case, authorize a judgment that one party or the other was the winner. Yet that is precisely what happens, and would happen in this case, if one or more individual precinct results are nullified. In other words, if a candidate could prove that 20% or more of the votes in his entire election were illegal, and that it is impossible to determine for whom they were cast, the only relief he could obtain would be a declaration of no election; whereas if he could prove the same facts with respect to a single precinct and thereby erase the contestee's overall majority, he could have himself declared the winner. Bearing in mind that the very basis for relief under the statute is that it cannot be determined who was elected, a judgment finding that the contestant was elected would reach an anomalous result.

■ We hold that the 20% rule can be applied only to an entire election, and not to any separate precinct or precincts constituting less than the entire political unit involved in the election for the office in question. The cases holding otherwise are overruled.

We think the ground on which the trial court rejected the tendered amendment to the complaint was untenable, and that the dismissal of the action must be judged on the basis of the complaint as Watts offered to amend it.

Gregory v. Stubblefield, Ky., 316 S.W.2d 689 (1958), involved a primary election and was decided under KRS 122.020, which specifically provides: "No ground of contest by either party shall be filed *or made more definite* by amendment after the expiration of the time allowed by this section for filing the original pleading." (Emphasis added.) The comparable provision of KRS 122.070, which governs the contest of a regular election, is as follows: "The petition * * * shall state the grounds of the contest relied on, and *no other grounds* shall afterwards be relied upon." (Emphasis added.) Under both statutes the addition of names in support of an allegation that illegal votes were cast is considered as a statement of new grounds. Durr v. Washington County, Ky., 339 S.W.2d 444, 445 (1960); Hodges v. Hodges, Ky., 314 S.W.2d 208, 213 (1958). That is not, however, the situation in this case.

■ Unless otherwise provided by statute, as in the instance of KRS 122.020, "a ground of contest improperly or defectively stated in the petition may be cured by an amendment filed after the time provided by the statute in which to file an original petition." Gross v. Ball, 258 Ky. 730, 81 S.W.2d 409, 411–412 (1935). See also Adams v. Helton, 296 Ky. 9, 175 S.W.2d 1012 (1943); and Herald v. Turner, 237 Ky. 827, 36 S.W.2d 623 (1931). It is our opinion that an amendment making an additional allegation to the effect that it is not possible to determine for whom the voters named in the complaint as having voted illegally cast their votes would not have stated a new ground of contest, but would simply have enlarged and made more definite the ground of contest theretofore stated in paragraph 4 of the complaint, and

should have been permitted. Gregory v. Stubblefield, Ky., 316 S.W.2d 689 (1958), does not apply to the amendment tendered by Watts in this case.

 Construing the tendered amendment most favorably to him, the best Watts possibly could do is to prove that all 101 votes (or, perhaps, all of Fugate's 98 votes) counted in his election at Meeting House Branch precinct were cast illegally. They do not constitute 20% of the 898 votes cast in his entire election, and he offers to allege only that he does not know for whom the illegal votes were cast. Hence his complaint as amended still would be deficient under the rule that in order to have illegal votes deducted from the contestee's vote it is "indispensably necessary" for the contestant to set out in his pleading the names of the illegal voters and for whom their votes were cast. Hogg v. Caudill, 254 Ky. 409, 71 S.W.2d 1020, 1021 (1934). This has been held to be so even if the contestant alleges that every vote in the precinct was cast illegally. Gregory v. Stubblefield, Ky., 316 S.W.2d 689, 692 (1958), and cases there cited. If the contestant does not know how the illegal votes were cast, and there were not enough to invalidate the election, he does not have a cause of action but only an inquiry, or a fishing expedition, for which the statutes do not provide. In order to have himself declared the winner he must allege and prove that specifically named votes sufficient to eliminate the contestee's majority were illegally cast for the contestee; and under the rule hereinbefore mentioned, those votes he proves to have been illegal without proving they were cast for the contestee must, to the extent of the number of votes received by the contestant himself in the same precinct or precincts,[2] be charged to the contestant.

The judgment is affirmed.

All concur.

2. See footnote 1, supra.